UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
JOAQUIN LUGO and CRISTINA MONTANEZ, :
                                    :
              Plaintiffs,           :
                                    :               **REPORT AND RECOMMENDATION**
         -against-                  :               16 Civ. 6340 (ENV) (VMS)
                                    :
CITY OF NEW YORK and POLICE OFFICER :
RYAN DOHERTY (Shield No. 20696),    :
                                    :
              Defendants.           :
                                    :
                                    :
                                    :
--------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

        In this civil rights action, brought pursuant to 42 U.S.C. § 1983, Plaintiffs Joaquin Lugo

and Cristina Montanez ("Lugo," "Montanez," or collectively "Plaintiffs")[1] allege that Defendant

City of New York ("City") and Defendant New York Police Department Officer Ryan Doherty

("Doherty")[2] violated their constitutional rights and/or failed to intervene when their rights were

---

[1] Plaintiffs were previously joined by a co-Plaintiff, Vanessa Baez ("Ms. Baez"), whose claims were dismissed in their entirety for failure to prosecute in an Order dated July 17, 2019. See ECF No. 31; see also ECF No. 38 (Order dated October 11, 2019, so-ordering the parties' stipulation to settlement of related sanctions).

Accordingly, the Clerk of Court is directed to amend the docket and caption to reflect that Ms. Baez is no longer a plaintiff in this action.

[2] Plaintiffs previously alleged claims against Defendants NYPD Sergeant Deane Powell, NYPD Officer Hernan Contreras, NYPD Officer Robert Molloy, NYPD Officer Derick Singh and NYPD Officer John Sullivan. See Amended Compl., ECF No. 14. In an Order dated December 20, 2017, the Court granted Defendants' motion to dismiss Plaintiffs' claims against these Defendants based upon Plaintiffs' statement that they did not intend to serve them. ECF No. 21 (Defendants' motion); ECF Dkt. Entry 12/4/2017 (Order referring motion); ECF Dkt. Entry 12/20/2017 (Order granting dismissal of claims against Powell, Contreras, Molloy, Singh and Sullivan).

Accordingly, the Clerk of Court is directed to amend the docket and caption to reflect that

being violated.[3]  See Am. Compl.  Plaintiffs also bring supplemental New York State constitutional and tort claims arising from the same set of facts, which the Court will discuss below.  See id.

Before the Court, on referral from the Honorable Eric N. Vitaliano, is Defendants' motion for summary judgment.  See ECF Nos. 39-41.

## I.  Preliminary Statement And Summary Recommendation

Principally relevant to Defendants' motion are Plaintiffs' federal and state false arrest claims which, broadly speaking, allege that Defendant Doherty arrested them without probable cause to believe that at a party they hosted either Plaintiff committed offenses pertaining to (1) the direct or indirect (through knowing acquiescence) provision of alcohol to minors, (2) the bottling and manufacture of alcoholic beverages, (3) the creation of a public safety hazard or disorderly premises and (4) employing unlicensed security guards.  As to Plaintiff Lugo specifically, he additionally alleges that Defendant Doherty lacked probable cause to arrest him with respect to a contested bench warrant.  The record is rife with material fact disputes requiring the denial of much of Defendants' motion.  For the reasons stated below, I respectfully recommend that the District Court **deny in part, grant in part** Defendants' motion for summary judgment.

## II.  Factual Background

Except as otherwise noted, these facts are drawn from the parties' respective statements

---

Sergeant Deane Powell (Shield No. 5244), Police Officer Hernan Contreras (Shield No. 18917), Police Officer Roberty Molloy (Shield No. 24779), Police Officer Derick Singh (Shield No. 27283), and Police Officer John Sullivan (Shield No. 18088) are no longer defendants in this action.

[3] The Court will hereinafter refer to Defendant City and Defendant Doherty collectively as Defendants.

made pursuant to Local Civil Rule 56.1 and their evidentiary submissions.  See Defs' 56.1 Stmt.,

ECF No. 39-2; Pltfs.' Resp. 56.1 Stmt., ECF No. 40-1; Defs' Reply 56.1 Stmt., ECF No. 41-1.[4]

The facts are construed in the light most favorable to Plaintiffs, the non-movants.  See Allstate

Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 456 (2d Cir. 2007).

### a. Plaintiffs' Arrangements To Host A Party For Their Son's Eighteenth Birthday At Atlantis Hall

In August 2016, Plaintiff Montanez signed a contract with Queens Party Hall ("Queens

Party") to rent one of its venues for Plaintiffs' son Ryan's eighteenth birthday (hereinafter

"Contract").  See Exh. 7, ECF No. 40-9, annexed to the declaration of Plaintiffs' Counsel

Dietrich Epperson ("Epperson Decl."), ECF No. 40-2.[5]  Pursuant to its terms, Plaintiffs paid

$1,125.00 to hold the party at the venue Atlantis Hall, located at 91-42 Lefferts Boulevard,

Queens, New York 11418, from August 19, 2016, at 8:00 p.m., until August 20, 2016, at 2:00

a.m.[6]  See Lugo Deposition Transcript 94:25-96:5 (hereinafter "Lugo Tr. [page #]: [line#]"),

---

[4] Because Defendants' Reply 56.1 Statement helpfully restates the content from the parties' opening, opposition and reply 56.1 statements, the Court will cite to it to the extent citations to such statements are made (hereinafter "Reply 56.1 ▶ [paragraph #]").

[5] The Court notes that all numbered exhibits cited were submitted by Plaintiffs and annexed to the Epperson Declaration with his attestation that they are true and accurate copies.  See Epperson Decl.  All lettered exhibits cited were submitted by Defendants and annexed to the declaration of Defendants' Counsel Hannah Faddis with her attestation that they are true and accurate copies.  See Faddis Declaration, ECF No. 39-3.  The Court will hereinafter cite to Plaintiffs' numbered and Defendants' lettered exhibits without reference to the corresponding counsel declarations.

[6] $1,000.00 of this was the rental fee and $125.00 was a fee for two Queens Party security guards to work the event and clean up afterwards.  See Exh. 7; Montanez Tr. 19:12-18.

Exh. 1, ECF No. 40-3[7]; Exh. 7 (Contract).[8]

The Contract was a pre-printed document which on its face included information about Medina Hall, located at 75-15 101st Avenue in Ozone Park, New York, i.e. a venue that was not Atlantis Hall.[9]  See Exh. 7.  For example, in the Contract's heading, Medina Hall's name and address was crossed out and Atlantis Hall's name and address handwritten in its place.  See Exh.

---

[7] The Lugo deposition transcript is one of three in the motion record.  The other two are Montanez's and Doherty's, which the Court will hereinafter cite to as "Montanez Tr. [page #]:[line #]" and "Doherty Tr. [page #]:[line #]," respectively.  See Exh. 2, ECF No. 40-4 (Montanez deposition transcript); Exh. 3, ECF No. 40-5 ("Doherty deposition transcript").

[8] The Court notes that both parties have submitted the Contract as an exhibit.  Compare Exh. 7, with Exh. M (same).  Wherever Plaintiffs have submitted a numbered exhibit that is duplicative of or slightly more complete than Defendants' submission, the Court will hereinafter cite to Plaintiffs' numbered exhibit alone.  These exhibits are as follows:

| Exhibit Description | Plaintiffs' Exhibit | Defendants' Exhibit |
|---|---|---|
| Lugo Deposition Transcript | Exh. 1, ECF No. 40-3 | Exh. C, ECF No. 39-6 |
| Montanez Deposition Transcript | Exh. 2, ECF No. 40-4 | Exh. D, ECF No. 39-7 |
| Doherty Deposition Transcript | Exh. 3, ECF No. 40-5 | Exh. E, ECF No. 39-8 |
| Doherty Memo Books | Exh. 4, ECF No. 40-6 | Exh. H, ECF No. 39-11 |
| Voucher, Container Photos | Exh. 5, ECF No. 40-7 | Exh. J, ECF No. 39-13 |
| Voucher, USD | Exh. 6, ECF No. 40-8 | Exh. K, ECF No. 39-14 |
| Contract | Exh. 7, ECF No. 40-9 | Exh. M, ECF No. 39-16 |
| Lugo Warrant | Exh. 8, ECF No. 40-10 | Exh. N, ECF No. 39-17 |

For clarity, the Court notes that it will cite to the following lettered Defendants' exhibits for which Plaintiffs have not filed duplicative or more complete submissions:

| Exhibit Description | Defendants' Exhibit |
|---|---|
| Complaint | Exh. A, ECF No. 39-4 |
| Answer | Exh. B, ECF No. 39-5 |
| Arrest Reports | Exh. F, ECF No. 39-9 |
| Complaint Reports | Exh. G, ECF No. 39-10 |
| Voucher, Tip Jar Photos | Exh. I, ECF No. 39-12 |
| Event Chronology Report | Exh. L, ECF No. 39-15 |
| District Attorney's Office Letter | Exh. O, ECF No. 39-18 |

[9] The Court notes that Queens Party's public Web site lists Medina Hall and Atlantis Hall as two different venues operated by that company.  See http://queenspartyhall.com/ (last accessed August 14, 2020).

7 at 1.   The Contract also contained various terms including:

(1) "Queens Party Hall, Inc., (dba: Medina Hall) reserves the right to change, adjust, or delete any rules and regulations found in this contract.  The hall also reserves the right to close down any event which poses a threat to the safety of the participants or the facility or violates any of the conditions stated."  Id. at 1.

(2) "[T]he approximate number of persons will not exceed 160."  Id. at 2.[10]

(3) "Medina Hall does not occupy [sic] a NY State liquor license nor does it provide alcoholic beverages for sale or consumption.  The customer understands and accepts the condition during a private function at which a responsible bartender must be employed to serve drinks to invited guests.  The laws of the state of New York apply.  The undersigned renting agent accepts complete responsibility for the respect of the laws of NY in the matter of alcohol consumption during the social event at Medina Hall.  The customer under any condition cannot sell alcohol for profit at this facility."  Id.

Plaintiffs also made arrangements for security, entertainment, food and refreshments for their guests.

Starting with security, Plaintiffs arranged to have two of Queens Party's security guards work the event.  Queens Party agreed to make their guards' services included as part of Plaintiffs' $1,125.00 rental fee and not subject to separate charge.  See Lugo Tr. 34:12-36:15, 95:5-96:5; Montanez Tr: 19:12-18.

For entertainment, Plaintiffs' son Ryan, who worked in music promotion at the time, booked a DJ and various musical acts.  See Lugo Tr. 26:11-27:22; Montanez Tr. 11:1-12. Plaintiffs had to pay the DJ but not the musical acts' fee; the acts agreed to perform at Ryan's party either because it was an opportunity to have their music heard, because they were Ryan's

---

[10] The parties dispute the significance of this term.  Although Defendants say that it sets Atlantis Hall's guest limit at 160, Plaintiffs say that this was a boilerplate term specific to Medina Hall which was not modified in the Contract to reflect the true Atlantis Hall limit which Queens Party told them was approximately 275.  See Lugo Tr. 116:18-117:17.

The Court notes that Queens Party's public Web site says that Medina Hall "seats 160 indoor" and that Atlantis Hall "seats 225 indoor/outdoor."  See http://queenspartyhall.com/ (last accessed August 14, 2020).

personal friends, or both.[11]  See Montanez Tr. 16:15-16; see also Lugo Tr. 28:10-29:2.

Plaintiffs bought food, drink and disposable kitchenware for the party.  See Lugo Tr. 42:12-43:2; Montanez Tr. 16:13-16, 19:22-24, 21:13-23; Exh. 5.[12]  The food included dishes from a local Dominican restaurant for buffet-style service and a birthday cake, and for drinks, Plaintiffs bought cases of bottled water, two-liter bottles of soda, and non-alcoholic fruit punch. See Lugo Tr. 22:3-25, 41:11-20, 42:12-43:2, 43:19-23, 96:9-97:15; Montanez Tr. 16:15-16, 19:10-11, 21:13-23, 58:5-9.  The non-alcoholic fruit punch was a powdered mix that had to be combined with water, which Plaintiffs did at home in four or five plastic containers.  See Lugo Tr. 23:17-24:1-14; Montanez Tr. 20:3-24, 56:12-22, 57:14-25; Exh. 5.  Each of these containers was approximately ten to twelve inches tall and five to six inches wide.[13]  See Lugo Tr. 24:1-11, 99:16-100:11 (Lugo identifying a photograph in Exh. 5 as depicting one of the plastic containers); Montanez Tr. 20:3-24, 56:12-22, 57:14-25; Exh. 5.

### b.  Plaintiffs' Management Of The Party

On the night of August 19, 2016, Plaintiffs and two adult friends (Ms. Baez and a friend of Ms. Baez's) went to Atlantis Hall for the party itself.  See Lugo Tr. 11:14-17, 21:2-13, 43:10-17.  Atlantis Hall had three general areas:  (1) its main doors leading into to the venue's lobby ("main doors"), (2) the venue's lobby with a second set of doors leading into the venue's party

---

[11] At depositions, Plaintiff Lugo called these musical acts "SoundCloud guys," a reference to the fact that they were trying to "come up" by publishing their music on that online platform.  Lugo Tr. 27:3-15.

[12] Plaintiffs' record does not clearly present how much they spent in total on party expenditures relating to the DJ, food, cake, water, soda, fruit punch and disposable cups for the party.

[13] The parties hotly dispute whether Plaintiffs' plastic containers held non-alcoholic fruit punch as they claim, or an alcoholic beverage.  The Court discusses Defendants' evidence in this regard infra.  See Sections II.a, II.c.

space ("lobby" and "lobby doors"), and (3) the venue's party space ("party space").  See Montanez Tr. 18:3-20.  For a person entering the party space through the lobby doors, there was a performance stage on the opposite wall directly in front of them and a dance floor between them and the stage.  See id.  To their left, there was a counter and adjacent table ("counter" and "table").[14]  See id.

Once at Atlantic Hall, Ms. Baez and her friend went to the counter and table, where they spent most of the party at the counter helping to set up and serve the food and non-alcoholic beverages to party guests.  See Lugo Tr. 43:6-25; Montanez Tr. 21:24-22:3.

Plaintiff Montanez went to the table where she helped set up and serve party food.  See Lugo Tr. 43:12-23 (testifying that Montanez set up and served the food with Ms. Baez's assistance); Montanez Tr. 22:23-25.[15]

Plaintiff Lugo spent most of the party at the main doors where he admitted Ryan's invited guests and the booked entertainment, and turned away others.  See Lugo Tr. 29:3-30:2, 33:24-34:11; Montanez Tr. 16:17-19.  As a practical matter, this meant that Plaintiff Lugo turned away people who appeared to him to be "much older" than twenty-one or twenty-two years old because Plaintiff Lugo thought that people in this age range were not likely to be Ryan's friends.[16]  See Lugo Tr. 29:4-14.  In addition, Plaintiff Lugo also turned away people whom he

---

[14] The parties at times dispute whether this should be called a bar or a counter.  Given that the term "bar" implies the service of alcohol, which is at issue in this case, the Court will use the more neutral term "counter."  See Reply 56.1 ⁋ 11, ECF No. 41-1.

[15] The Court discusses the parties' dispute regarding whether Plaintiffs sold, served or otherwise provided alcohol to underage guests during the party.  See infra Section II.c.

[16] Defendants argue that Plaintiff Lugo tried to limit attendance to minors.  See Reply 56.1 ⁋ 8.  Even assuming that were true, it would be immaterial to the resolution of this motion given triable fact issues regarding underage drinking at the party.  See infra Sections II.a, II.c, V.b.

thought appeared rowdy and/or perhaps intoxicated.  See Lugo Tr. 29:3-22, 38:1-6.  From those whom Plaintiff Lugo admitted, he also collected a $10 cover, which Plaintiffs testified was to help them recoup what they paid for hall rental, the DJ, food and drinks.  See Lugo Tr. 31:20-32:2; Montanez Tr. 26:22-27:1, 37:2-5.[17]

In admitting guests, Plaintiff Lugo worked in tandem with one of the Queens Party security guards stationed in the lobby.  See Lugo Tr. 34:12-21, 36:12-37:20.   After Plaintiff Lugo admitted and collected a cover from a guest, the guard patted the individual down for contraband before allowing the person into the party space itself.  See Lugo Tr. 34:12-21, 36:12-37:20.  On a number of occasions during the night, when Plaintiff Lugo had to leave the main doors, he asked the lobby guard to watch the doors and cease admissions pending his return.[18] See Lugo Tr. 30:19-25.[19]

Over the course of the night, somewhere between 150 to 200 guests were present at Ryan's party in a given moment.[20]  See Doherty Tr. 29:6-8; Montanez Tr. 16:10-12 (testifying to the same range).  The majority were Ryan's friends from school and/or Plaintiffs' neighborhood,

---

[17] Plaintiff Lugo excepted some individuals from this $10 cover charge, such as some of Ryan's known friends or musical acts performing the party.  See Lugo Tr. 26:4-10.

[18] For example, Plaintiff Lugo had to leave to go to the bathroom on a number of occasions or, at around 11:00 p.m., he stepped away to remove two to four guests whom Plaintiff Montanez found to be too rowdy.  See Lugo Tr. 29:23-30:3, 30:4-14, 31:4-19, 45:5-46:15; Montanez Tr. 29:22-30:10.

[19] According to Plaintiff Lugo, one of the guards took umbrage with Plaintiff Lugo's requests that he fill in and, when Plaintiff Lugo returned, he found that the guard had let people in—some of whom may have been unknown—while Plaintiff Lugo had stepped away.  See Lugo Tr. 30:4-31:3.

[20] Counting the total number of guests who came and went over the course of the night but who were not all present at once, Plaintiff Lugo testified that this number may have exceeded 200.  See Lugo Tr. 33:6-12.  The Court will use the undisputed 150 to 200 range for simultaneous attendance as the one relevant to its motion analysis.  See infra Section V.d.

and were under 21 years of age.  See Lugo Tr. 38:1-6.[21]  Others at the party included Plaintiffs themselves, Ms. Baez, Ms. Baez's adult friend, Plaintiffs' three youngest children, the DJ, musical acts and the security guards.  See Lugo Tr. 39:13-25; Montanez Tr. 17:1.

### c. Plaintiffs Deny That They Sold, Served Or Otherwise Provided Alcoholic Beverages At The Party Or Even Observed Or Ignored Underage Drinking At The Party

Plaintiffs deny that they, Ms. Baez or Ms. Baez's adult friend sold, served, or otherwise provided alcohol to underage guests at any moment of the party.  See Lugo Tr. 40:16-22 (testifying that he did not buy, bring or know of any alcohol at the party), 45:2-4, 46:16-25 (testifying that he never saw alcohol on the counter and that Ms. Baez and her friend did not bring  alcohol to the party), 82:14-83:6 (testifying he did not observe or know of any party guests drinking alcohol at any point that night); Montanez Tr. 22:4-9 (testifying to the same).[22]

Plaintiffs also testified that they did not observe or know of underage drinking at the party, and that they did not ignore such known activity.  See Lugo Tr. 45:2-4 (testifying that he did not see anyone drinking alcohol during the party at any point), 82:14-83:6 (testifying to the same and that his wife told him the same); Montanez Tr. 22:4-9 (testifying that she did not observe or know of anyone drinking alcohol at any point during the party).

Finally, Plaintiffs say there is one singular exception to whether they knew of any alcohol on the party premises at all, which is that Plaintiff Montanez admits that she brought one bottle

---

[21] By Plaintiff Lugo's estimate, approximately twenty-five percent of guests were around twenty or twenty-one years old, and the balance were closer to Ryan's age.  See Lugo Tr. 38:1-9; Montanez Tr. 59:12-16 (testifying that she was uncertain as to how many of Ryan's friends were 21 or older).

[22] Plaintiffs admit to one exception to this general denial, discussed infra: Montanez brought and stored one bottle of alcohol for Plaintiffs to have a drink themselves that night although they never did because they became too busy.  See Lugo Tr. 40:16-41:10, 44:21-45:4; Montanez Tr. 21:3-12, 51:15-20, 59:3-6.

of Hennessy with her that night from which Plaintiffs hoped to have a drink themselves and which she stored behind the counter and out of public view.  See Lugo Tr. 40:16-41:10 (testifying that Plaintiffs brought no alcohol to the party with the exception of this one bottle), 44:21-45:4; Montanez Tr. 21:3-12 (testifying this bottle was the only alcohol), 51:15-20 (testifying that this one bottle was kept behind the bar), 59:3-6.  According to Plaintiffs, they were too busy to have their intended drink and this bottle remained stored and out of view the entire evening.  See Lugo Tr. 40:16-41:10 (testifying that Plaintiffs were too busy at the party to have their intended drink), 44:21-45:4 (testifying that he did not drink any alcohol during the party); Montanez Tr. 21:3-12, 51:15-20. 59:3-6 (testifying that Plaintiffs never had a drink from this stored bottle during the party).

### d.  Defendant Doherty's Performance Of A "Walk-In" At Atlantis Hall

Some time after midnight on August 20, 2016, Defendant Doherty and other members of Defendant Doherty's 102nd Precinct conditions team arrived in vehicles outside Atlantis Hall in connection with a "walk-in" at the venue, which refers to the fact that police simply decided to go to the venue and walk in.[23]  See Lugo Tr. 47:1-20, 53:12-55:6; Doherty Tr. 6:23-9:6, 12:18-13:22.  At the time, Defendant Doherty was familiar with the venue from prior visits, and he knew that it did not hold a liquor license.  See Lugo Tr. 12:18-13:22, 53:25-55:6, Doherty Tr. 6:23-9:6, 12:18-13:22.

Defendant Doherty and his team initially remained in their vehicles outside Atlantis Hall

---

[23] The Court does not consider whether Doherty and his team's apparently warrantless walk-in at Atlantis Hall raised any Fourth Amendment issues, as the parties do not address it.  See, e.g., Marshall v. Barlow's, Inc., 436 U.S. 307, 312. (1978) ("[A] search of private houses is presumptively unreasonable if conducted without a warrant.  The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property."); ECF Nos. 39-43.

for five to seven minutes.  See Lugo Tr. 47:1-11, 53:25-54:3.  From that vantage point, Defendant Doherty's team allegedly observed a party guest go to a corner store and buy a beer prior to entering Atlantis Hall.  See Lugo Tr. 64:10-19 (stating that one of the officers on Doherty's team told him about this police observation prior to the Plaintiffs' arrests).

At around this same time, a woman called 911 to report that her fifteen-year-old daughter was at the party and that there was underage drinking there.  See Exh. L.  According to Defendant Doherty, he had no knowledge of nor was he responding to the 911 call or any related dispatch or communication at the time of the Atlantis Hall walk-in.  See Doherty Tr. 12:18-13:22; Lugo Tr. 47:7-20, 48:12-14, 53:25-55:6.  In relevant part, the complaint was documented as follows:

> FC STS THERE IS UNDERAGE DRINKING
>
> PARTY STARTED AT 8PM TIL CURRENT
>
> FC STS 15 YO DAUGHTER IS AT THE EVENT AND WAS ADV OF THE DRINKING

Exh. L at DEF 040.[24]

Defendant Doherty testified that at the time of his arrival at Atlantis Hall, he saw approximately twenty individuals in front ranging in age from sixteen to twenty-five years old. See Doherty Tr. 18:11-14.  None of the twenty individuals Defendant Doherty saw outside was drinking alcohol or engaged in any disruptive or otherwise criminal behavior.  See Doherty Tr. 19:10-20:4, 20:23-21:2.

### e.  Defendant Doherty's First Entry Into Atlantis Hall

It was nearly 1:00 a.m. when Defendant Doherty and his team first exited their vehicles

---

[24] The Court notes that the call documentation does not state that the complainant's daughter had firsthand knowledge of the information reported.  See Exh. L.

and approached Atlantis Hall to enter; as they did, none of the individuals standing outside attempted to flee the police.  See Lugo Tr. 12:18-13:22, 53:25-55:6, Doherty Tr. 6:23-9:6, 12:18-13:22, 19:10-20:4, 20:23-21:2.  On entering the party space, Defendant Doherty estimates seeing anywhere from 150 to 200 guests.  See Doherty Tr. 29:6-8.[25]  From a distance of twenty to twenty-five feet, Defendant Doherty saw Ms. Baez behind the counter and Plaintiffs standing approximately ten feet away from it talking to several individuals "older than the average guest age."  See Doherty Tr. 28:17-29:4, 29:24-30:14, 31:13-32:10; Montanez Tr. 23:7-12.[26]  Plaintiffs testified that there was no alcohol on the counter at this moment, let alone at any time during the party; they likewise deny that they or anyone directly provided alcohol or that they knowingly ignored the presence or consumption of alcohol at the party.  See Lugo Tr. 46:19-25; see also id. 40:16-22, 45:2-4, 82:14-83:6; Montanez Tr. 22:4-9.  Defendant Doherty contradicts this, claiming various full and partially full alcohol and beer bottles were there and that Ms. Baez was "handling"—but not selling or serving—alcohol.  See Doherty Tr. 33:5-10, 33:24-34:6 (testifying that he saw Ms. Baez "handling" alcohol, which he described as moving it around, but never saw her selling or providing alcohol to anyone), 34:23-35:20, 43:6-8.[27]

In the same general vicinity, Defendant Doherty claims to have seen about four

---

[25] Plaintiffs concede Defendants' estimated range of 150-200 guests at this time, so the Court treats this as the undisputed fact pertaining to the number.  See Reply 56.1 ⁋ 10.  Plaintiffs elsewhere contest Defendants' larger estimated range as 150-250 people.  See Reply 56.1 ⁋ 28. Because it is irrelevant to the Court's analysis which of the two estimated ranges is used, the Court will use the one the parties do not dispute, namely 150-200 people.  See Reply 56.1 ⁋ 10.

[26] Plaintiffs admit only that the majority of party guests were under twenty-one.  See Reply 56.1 ⁋ 32.

[27] It is indisputed that Defendant Doherty did not see Plaintiffs procuring, selling, delivering or giving any alcohol; accordingly, the fact dispute in this respect pertains to his claims about Ms. Baez alone.  See Doherty Tr. 49:6-12.

individuals whom he believed to be under twenty-one years old.  See Doherty Tr. 28:17-29:4, 29:24-30:14, 37:19-23.  Defendant Doherty approached one, who turned out to be a 20-year old named Vlad with a beer either in his pocket or his hand,[28] and who was then issued a summons. See Lugo Tr. 63:10-22; Doherty Tr. 38:6-13, 41:10-42:9.  Plaintiffs dispute that they knew that Vlad possessed the beer prior to Defendant Doherty's discovery of it, or that they otherwise knew of any other underage drinking at the party.  See Lugo Tr. 40:16-22, 45:2-4, 46:16-25, 82:14-83:6; Montanez Tr. 22:4-9.  Although Plaintiffs do not dispute that Vlad was summonsed, their evidence suggests that police knew that Vlad may have brought the beer to the party himself and not gotten it there, as corroborated by Plaintiffs' general denials about serving or knowing of alcohol at the event.  See Lugo Tr. 60:7-12, 64:10-24 (Lugo testifying that in the context of the Vlad incident, one of the officers told him that they had seen "one of the guys purchase a beer and come to the venue"); Montanez Tr. 27:5-8, 27:21-28:3, 29:20-21; see also Lugo Tr. 50:12-25, 50:20-25, 59:10-25, 63:25-24.  Defendant Doherty claims that this fact issue is defeated by alleging that, when he asked Vlad where he got the beer, Vlad pointed at Ms. Baez; but even assuming that Vlad made the gesture, there is a fact issue as to the significance of the gesture given evidence that there was no alcohol on the counter where Ms. Baez stood.  See Doherty Tr. 43:9-25 (testifying that Vlad pointed at Ms. Baez).

Defendant Doherty also alleges that, after Vlad, he also interacted with two allegedly sixteen-year-olds holding red plastic cups.  See Doherty Tr. 40:15-41:9, 42:13-22.  There is almost no evidence in the record about these "unidentified" individuals holding red cups, but

---

[28] Plaintiffs state that they believe the beer that Defendant Doherty found in Vlad's pocket or hand might have instead been a can of margarita.  Because this question is immaterial to the motion, the Court refers to the drink found in Vlad's pocket or hand as a beer.  See Reply 56.1 ¶ 33.

Defendant Doherty says that their cups smelled of alcohol, and that they also pointed to Ms. Baez when asked where they got their drink.  See Doherty Tr. 43:13-25 (testifying that the two sixteen year olds, like Vlad, gestured at Ms. Baez); Exh. 4 at DEF018.  Plaintiffs dispute these interactions as well, on the same evidence and argument invoked vis-à-vis Vlad, supra.  According to Defendant Doherty, these "unidentified" sixteen-year-olds then "fled from [the] premises," and he never saw them again.[29]  See Doherty Tr. 45:10-14; Exh. 4 at DEF018.  Defendant Doherty has not submitted any statements, sworn or otherwise, from Vlad or the two unidentified sixteen year olds regarding the incident.[30]

### f.  Defendant Doherty Briefly Leaves Atlantis Hall Then Re-enters

Shortly after Defendant Doherty and the other officers arrived, officers ordered the party shut down.  See Lugo Tr. 47:12-48:16; Montanez Tr. 24:2-11, 24:24-25:1.  Plaintiff Lugo turned Atlantis Hall's lights on, and guests left the building.  See Lugo Tr. 47:12-25.

Although Plaintiffs testified that guests left without creating any disturbances, see Lugo Tr. 71:2-16, 72:3-6; Montanez Tr. 30:18-20, 50:25-51:2,[31] Defendant Doherty says he had to leave Atlantis Hall when the party shut down to help with crowd control, see Doherty Tr. 49:13-16.[32]  There are contradictions in Defendant Doherty's testimony about whether there was any

---

[29] The parties very hotly dispute whether, as Defendant Doherty claims, these three minors made credible gestures or statements about party alcohol that implicated Ms. Baez and which Defendant Doherty claims are material to his motion.

[30] Defendant Doherty also did not obtain or submit such deposition testimony on the motion.

[31] Evidence shows that it took as little as seven minutes for the party to disperse.  See Lugo Tr. 66:11-15; Doherty Tr. 49:13-16.  If a fact finder credits that 150 to 200 party guests dispersed without incident in seven minutes, it could also plausibly infer that the party ended in an orderly fashion.

[32] The parties' dispute over whether the party premises were disorderly is pertinent to this motion only with respect to the period of time that Defendant Doherty arrested each Plaintiff, which was

14

disorder at this time.  For example, at times Defendant Doherty corroborates Plaintiffs'
recollection that guests left the party in an orderly fashion; he testified that there were no
disruptions, arrests or incidents, and that "the crowd just dispersed on their own . . . [police]
didn't really have to do anything."  Doherty Tr. 47:24-48:24.  Elsewhere, Defendant Doherty
claims that the premises "were getting disorderly, basically, people yelling, trying to start fights
in the street."  See Doherty Tr. 45:3-14.[33]

Seven to twenty minutes after Defendant Doherty left Atlantis Hall as guests left, he re-
entered the venue.  See Doherty Tr. 49:13-16; Lugo Tr. 66:11-15.  Plaintiffs testify that there
were no alcohol containers on the counter during Defendant Doherty's re-entry, just as there had
been none during Defendant Doherty's first entry.  See Lugo Tr. 46:19-25.  Plaintiffs allege that
Defendant Doherty and his team then searched Atlantis Hall's garbage cans.  See Lugo Tr. 49:1-
50:11, 60:13-25, 62:11-20, 69:9-11, 100:12-22; Montanez Tr. 31:18-24, 43:18-23 ("they brought
the bottles over"), 55:3-56:11, 59:10-11.  Plaintiffs testified that in all these venue garbage
searches, police found only three empty alcoholic containers (one Heineken, one Coco Nutz, one
Hennessy) which police then set on the counter where no alcohol had been before.  See id.

---

around the time of the party shut down.  The parties do not dispute that the party was otherwise
orderly throughout the night and up to the time of the party shutdown.  For example, Defendant
Doherty testified that when he arrived, there were people outside the hall engaged in
"noncriminal social behavior" like talking or smoking cigarettes, "and that was pretty much it."
He also testified that no one outside appeared to be drinking, and that no one attempted to flee
when police arrived.  See Doherty Tr. at 18:4-20:4, 20:23-21:2.  Plaintiff Lugo offered similar
testimony about the party generally – "the music wasn't crazy loud, it was nice[.]"  Lugo Tr.
40:1-15.  "There wasn't really no commotion, no fighting, nothing[]" with the exception of the
"one little thing" that was 2-4 guests whom Plaintiffs deemed too rowdy at approximately 11:00
p.m. (who Plaintiff Lugo escorted out well before Defendant Doherty arrived).  Lugo Tr. 40:1-
15; Montanez Tr. 29:22-30:10.

[33] The Court notes that it was when Defendant Doherty left Atlantis Hall to tend to the disputed
disorder that he lost track of the two unidentified sixteen year olds who allegedly gestured at Ms.
Baez as the source of the contested drink in their cups.  See Doherty Tr. 45: 10-14.

Plaintiff Montanez additionally testified that police found her closed Hennessy bottle from behind the counter, dumped its contents, and set it on the counter next to the three other empties that had been staged there from the garbage searches.  See Montan ez Tr. 55:3-56:3, 56:4-11, 59:10-11.

Plaintiffs testified that Defendant Doherty then took four (4) photos of the four empties that he knew had just been staged on top of the counter to fabricate evidence that they had provided alcohol to minors or had knowingly permitted minors to drink alcohol at the party.  See Exh. 5; Lugo Tr. 62:21-63:2, 69:5-11; Montanez Tr. 55:3-56:3, 56:4-11, 59:10-11.   Although it is not in dispute that Defendant Doherty took four photos, he alleges that the four empties were on the counter at the time of his second entry, and he denies any venue garbage can searches or staging of the four photos.[34]  See Doherty Tr. 59:4-6; Exh. 5.

Further, a plastic cup and two containers also appear in the four photos alongside the four empties which Plaintiffs say held the non-alcoholic fruit punch they bought and made themselves before the party.  See Lugo Tr. 24:1-5, 99:16-100:11 (testifying that a plastic container depicted in Exh. 5 contained non-alcoholic fruit punch Plaintiffs had made); Montanez Tr. 20:8-24, 56:12-57:25 (testifying that container in Exh. 5 held non-alcoholic punch Plaintiffs made).  In contrast, Defendant Doherty effectively contends that he believes Plaintiffs must have spiked it because he smelled their contents as alcoholic.  See Doherty Tr. 63:5-16 (testifying that the same plastic container in Exh. 5 smelled to him of alcohol).

---

[34] Defendant Doherty further claims that in any event the four photos depict "significantly less" alcohol than he observed during his first party entry; he speculates that Plaintiffs must have disposed of ninety percent of it during the seven to twenty minutes between Defendant Doherty's first and second entries.  See Doherty Tr. 58:7-59:1. Defendant Doherty suggests that Plaintiffs must have disposed of ninety percent of party alcohol by throwing it in the garbage but testified that neither he nor his team conducted a search of garbage cans to confirm his speculation.  See id. 59:7-61:4, 78:2-6, 120:4-20.

At some point, Defendant Doherty spoke with the two Queens Party security guards and discovered that neither had a valid security guard license.  See Doherty Tr. 10:25-11:5; Exh. 4.[35] When one guard was confronted with the information that this was an offense, he "constantly changed" the name he gave Defendant Doherty before finally identifying himself truthfully.  See id.  Both were arrested.  See Exh. 4; Doherty Tr. 20:9-15, 24:12-25:5.   Defendant Doherty alleges in this action that during his conversations with the guards, one of them told him that Plaintiffs charged guests a $10 cover charge, which included alcohol.  See Doherty Tr. 21:6-22. Plaintiffs dispute that this occurred or that Defendant Doherty could have reasonably believed the accusation given that Defendant Doherty knew that it was contradicted by the absence of any alcohol that would suggest such event-wide service.[36]  Defendant Doherty did not submit a sworn statement or deposition testimony of the guard pertaining to this disputed accusation, and Defendant Doherty's written account of his guard conversations made approximately 1.1 hours later does not include the accusation.  See Doherty Tr. 85:22-25, 86:7-19; Exh. 4 at DEF018-019.[37]

---

[35] By around this time and prior to Plaintiffs' arrests, Defendant Doherty knew that Plaintiffs had rented the venue for the evening and that Atlantis Hall's owner was not on the premises.  See Doherty Tr. 46:7-16; Exh. 4 at DEF019 (memo book entries written by Defendant Doherty noting Plaintiff's hall rental and venue owner's absence); Exh. F (arrest reports written by Defendant Doherty noting Plaintiffs rental of the venue and that they hired security at the location).

[36] Again, Plaintiffs deny providing alcohol or ignoring known alcohol consumption at the party. See Lugo Tr. 40:16-22, 25:2-4, 46:16-25, 82:14-83:6.

[37] The relevant part of Defendant Doherty's memo book reads as follows:

> Was also met with [redacted] who said he was security guard, but could not produce license, SILA to, found police asp in right front cargo pocket.  Then spoke with [redacted], DOB [redacted], [redacted] of [redacted] who also stated he was a security guard and that his license was suspended, and could not produce license card.  After being asked for name, which constantly changed, and

While still at Atlantis Hall and prior to arresting Plaintiffs, Defendant Doherty and other officers spoke to them about, among other things, the fact that Plaintiffs had rented Atlantis Hall for the party that night and that they were not the venue's owners.  See Doherty Tr. 11:14-19 (testifying about the owner of Atlantis Hall, who was not Plaintiffs), 123:10-13 (testifying that both Plaintiffs told him they rented the venue); Exh. 4 at DEF019 (memo book authored by Defendant Doherty stating that Plaintiffs rented the venue and owner not on premises); Exh. F (arrest reports authored by Defendant Doherty stating that Plaintiffs rented the venue).

### g.  Defendant Doherty Arrests All Plaintiffs, Who Were Later Released When The District Attorney's Office Declined To Prosecute

On August 20, 2016, at approximately 1:48 a.m, Defendant Doherty arrested Plaintiffs and Ms. Baez.  See Lugo Tr. 74:18-20; Montanez Tr. 32:5-12; Exh. F at DEF004; Exh. H at DEF019.

At the precinct, Defendant Doherty vouchered the four photos and the counter tip jar as arrest evidence.  See Exh. 5; Exh. I.  Defendant Doherty also seized approximately $1,363.00 from Plaintiff Lugo at the precinct; then he vouchered it for safekeeping and not as arrest evidence.  Exh. 6; Lugo Tr. 72:19-73:2.[38]

Defendant Doherty then charged Plaintiffs with a litany of offenses, some of them premised on allegations that they provided alcohol to minors at the party.  See Exh. F; Exh. G. Plaintiff Lugo testified that he spoke with Defendant Doherty and other officers at the precinct and earlier that night about facts including whether guests could have brought alcohol into the

---

informed he was committing an offense, he finally provided proper pedigree in for.

Id.

[38] It was later returned.  See Exh. 6; Lugo Tr. 73:1-4, 98:21-25; Montanez Tr. 37:13-16, 53:8-15.

18

party.  See Lugo Tr. 50:17-51:1, 60:7-12, 64:10-19, 67:3-22, 105:13-18, 109:13-15.   According

to Plaintiff Montanez, when Defendant Doherty explained why Plaintiffs were being arrested,

Defendant Doherty said that he knew that Plaintiffs were not responsible.  See Montanez Tr.

45:13-46:12 (testifying she was told it "wasn't [Plaintiffs]").

 Defendant Doherty authored arrest and complaint reports for Plaintiffs that included

allegations that, when viewed alongside his evidence in this litigation, raise and/or highlight

triable issues of material fact including Defendant Doherty's credibility.  See Exh. F (arrest

reports); Exh. G (complaint reports).  For example, Defendant Doherty wrote in his complaint

report that "[a]t t/p/o while conducting a business inspection, Deft 1 [Ms. Baez] was observed

behind the bar of an unlicensed premises serving alcohol to patrons between the ages of 20 and

16."  Exh. G at DEF011.   Yet in this action Defendant Doherty gave sworn testimony that he

never saw Ms. Baez serving alcohol.  See Doherty Tr. 33:5-10 ("I didn't see her actually serving

alcohol to anyone."), 34:3-6 ("I did not observe her selling . . . or provide [alcohol].").

Defendant Doherty's arrest and complaint reports also both stated his knowledge that Plaintiffs

rented Atlantis Hall.  See Exh. F at DEF004, 007; Exh. G at DEF011; see also Exh. 4 (memo

book authored by Defendant Doherty noting that Plaintiffs "rented the hall" and its owner was

not on the premises); Doherty Tr. 9:17-10:1 (testifying knew it was a rental), 11:25-12:4 (same),

122:24-123:9 (testifying that he knew that the event was a one-off party for which Plaintiffs had

rented the hall from someone else).  Despite knowing this, Defendant Doherty brought an arrest

charge against Plaintiffs as a security guard company employing the guards.  See Exh. F at

DEF004, DEF007 (charging Plaintiffs under N.Y. Bus. L. § 89-g(1)(a)).  Finally, Defendant

Doherty wrote that "Deft 2 [Montanez] and 3 [Lugo] also stored alcohol behind the bar," which a

jury could understand to be a reference to the single and stored bottle of alcohol which Plaintiffs

had for personal use.  Exh. G at at DEF011.

While at the precinct with Plaintiffs (Plaintiffs claim this was many hours after their arrests), Defendant Doherty claims to have found an extremely old but still active bench warrant for Plaintiff Lugo while running a computer check; according to Defendant Doherty, the warrant was for Plaintiff Lugo's failure to appear on a summons or appearance ticket for a minor offense in 2000.  See Exh. F at DEF004 (arrest report authored by Defendant Doherty calling the warrant active); Exh. 8 (warrant bearing a date/time stamp many hours after Plaintiffs' arrests). Defendant Doherty then added a charge to Plaintiff Lugo's arrest report for failure to respond to an appearance ticket in connection with the alleged active warrant he discovered.  See Exh. F at DEF004.

Plaintiff Lugo disputes that he was the subject of the warrant or that it was active on various grounds.  Plaintiff Lugo testified that he never committed or was summonsed for the underlying warrant offense, and that the name on the warrant is not his own (although it is similar).  See Lugo Tr. 7:17-18, 87:16-93:9; Exh. 8.[39]

Even assuming that Plaintiff Lugo were the warrant's subject, he also disputes that it was active because he had never been called to answer for it before during various court appearances he made in other matters between 2000 and 2016.[40]  See Lugo Tr. 87:16-93:9, 118:20-119:13.

---

[39] Defendants reply that the name issue is likely the result of a slight misspelling, see Reply 56.1 ¶ 55, but Defendants do not offer evidence that the misspelling should be read in their favor.  The Court need not resolve the dispute as it is immaterial to the Court's resolution of this aspect of the motion.  See infra Section V.f.

[40] The parties have not raised or briefed the relevance, if any, of the warrant's age regarding whether or not it was active at the relevant time, i.e., whether the warrant may have been invalid under an applicable limitations period.  See, e.g., People v. Landy, 125 A.D.2d 703, 704-05 (2d Dep't 1986) (affirming the dismissal of bail jumping charge commenced against a defendant eight years after he who failed to appear in court such that a bench warrant was issued in his name, citing minimal attempts to locate the defendant for two of those years and the complete

Plaintiff Lugo also disputes that it was active because he was not made to answer for it in this case as discussed infra.  On its face, the warrant in evidence says nothing about whether it was active on August 20, 2016.  See id.  Evidence also has not been submitted showing that the warrant was active on the incident date or whether the warrant has ever been closed (and, if so, if that occurred before or after the incident date)—for example, records from the computer system purportedly checked by Defendant Doherty to learn such information or any like database.

At approximately 4:00 p.m., Plaintiffs and Ms. Baez were released from custody after the District Attorney's Office declined to prosecute them.  See Lugo Tr. 74:17-20, 75:9-23; Montanez Tr. 34:4-15; Exh. O.  Neither Plaintiff Lugo nor Plaintiff Montanez saw a judge prior to their release.  See Lugo Tr. 75:13-76:4; Montanez Tr. 34:17-20; Exh. F; Exh. O.  Plaintiff Lugo cites the fact that he was released at the same time as Plaintiff Montanez without having to appear before a judge for the alleged warrant as further showing that it was not active, as Defendant Doherty claims (but has submitted no documentary evidence to prove).  See Exh. F at DEF DEF004 (Plaintiff Lugo's arrest report assigning him arrest identification number ending in the digits 609 in connection with his charges including the warrant charge); Exh. O at BAEZ004 (District Attorney's Office decline-to-prosecute letter stating that Plaintiff Lugo's arrest under arrest number 609 was dismissed by the prosecutor's office "prior to Criminal Court arraignment" in a "final disposition" of the matter).

## III.  Applicable Law For Summary Judgment Under Rule 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

cessation of effort for nearly six of them).  Accordingly, the Court need not reach the subject.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). "It is the movant's burden to show that no genuine factual dispute exists," and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-movant may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986).

Local Civil Rule 56.1 requires that the movant file a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried," and each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph[.]" Local Civ. R. 56.1(a)-(c). Each statement must be supported by a citation to admissible evidence. Id. at 56.1(d). The response by the non-moving party must be supported by a "citation to evidence which would be admissible" as required by Federal Rule of Civil Procedure 56(c). Local Rule 56.1(d). A reviewing court "may not rely solely on the statement of undisputed facts[,] . . . [i]t must be satisfied that the citation to evidence in the record supports the assertion." Vt. Teddy Bear, 373 F.3d at 244 (citing Giannullo v. City. of N.Y., 322 F.3d 139, 143 n.5 (2d Cir. 2003)). A district court "must ask not

whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  Simpson v. City of N.Y., 793 F.3d 259, 265 (2d Cir. 2015).  It is not appropriate for the court to make credibility assessments or resolve conflicting versions of the events presented; these are essential questions for a jury. See id.

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001).  Local Rule 56.1 guides the court in granting summary judgment where "appropriate," i.e., where "there is no genuine issue as to any material fact," Fed. R. Civ. P. 56(c), and "the . . . admissions on file . . . show that . . . the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(e)."  Holtz, 258 F.3d at 74 n.1.  "If the opposing party [] fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."  Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003).  District courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may "opt to conduct an assiduous review of the record."  Holtz, 258 F.3d at 73.

## IV.  The Court Should Grant The Motion For Summary Judgment On Plaintiffs' Withdrawn Claims

In Plaintiffs' memorandum opposing Defendants' instant motion, they withdrew the following claims against the City and Doherty that remained in their operative complaint:  (i) federal failure to intervene claims; (ii) federal and state malicious abuse of process claims; and (iii) a federal municipal liability claim against the Defendant City of New York.  See Plaintiffs' Memorandum at 5, ECF 40 (hereinafter "Pltfs' Memo at [page #]") (withdrawing claims for failure to intervene, malicious abuse of process, and municipal liability); see also Am. Compl. ¶¶

31-37 (failure to intervene claims); id. ¶¶ 38-42, 59-63 (malicious abuse of process claims); id. ¶¶ 43-53 (Monell claim).   Plaintiffs have also withdrawn their undeveloped and unspecified "catch-all" federal § 1983 claims,"[41] see Am. Compl. ¶¶ 22-27, and their federal §1983 false arrest claims but only to the extent pleaded against the City Defendant (they survive as pleaded against Defendant Doherty and are discussed infra), see id. ¶¶ 28-30.  See Dkt. Entry 8/12/2020; Compl. ¶¶ 22-27; ECF No. 42 at 42.[42]

Given Plaintiffs' withdrawal of their failure to intervene, malicious abuse of process, Monell, catch-all § 1983 claims, and federal § 1983 false arrest claims against the City Defendant in response to Defendants' summary judgment, the Court respectfully recommends that the Court **grant** Defendants' summary judgment motion to dismiss them from the action.[43]

## V.  The Court Should Deny The Motion For Summary Judgment On Plaintiffs' Federal False Arrest Claims Against Defendant Doherty

The Court next turns to Plaintiffs' federal § 1983 claims alleging that Defendant Doherty violated their right to be free from false arrest under the Fourth and Fourteenth Amendments of the United States Constitution.  See Am. Compl. ¶¶ 28-30.

---

[41] The Court uses the catch-all label because these claims alleged various federal § 1983 violations by listing a string of federal constitutional amendments without specifying how the facts of this action implicated them. See Am. Compl. ¶¶ 22-27.

[42] The Court notes that Plaintiffs withdrew their catch-all § 1983 claims on the record during an August 12, 2020, motion conference.  See Dkt. Entry 8/12/2020.  As for their federal § 1983 false arrest claims against the City Defendant, Plaintiffs withdrew them in a supplemental filing after the 8/12/2020 motion conference.  See ECF No. 42 at 1.

[43] Taking these withdrawn and dismissed claims into account alongside the other ways in which the action has previously narrowed, Plaintiffs have three remaining categories of claims which the Court will analyze infra:  (1) Plaintiffs' federal § 1983 false arrest claims against Defendant Doherty, see Am. Compl. ¶¶ 28-30; (2) Plaintiffs' New York State false arrest claims against Defendant Doherty, see id. ¶¶ 54-58; and (3) Plaintiffs' New York State respondeat superior claims against the City Defendant, id. ¶¶ 9-14, 54-58.

a.  **Relevant Law And Motion**

"[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985).  There are two essential elements to any claim raised under § 1983: "[i] the defendant acted under color of state law," which Defendant Doherty concedes here; "and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges."  Annis v. Cnty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).

The Court's analysis of whether Plaintiffs suffered a denial of their Fourth Amendment right to be free from unreasonable seizures, "which includes the right to remain free from arrest absent probable cause," looks to state law for the claims' elements. Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006); see Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (the elements of a false arrest claim look to state law).  In New York, the elements of false arrest are: "[i] the defendant intended to confine [plaintiff], [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement, and [iv] the confinement was not otherwise privileged."  Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks & citation omitted).   Probable cause is a complete defense.  Id. "When an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense."  Dickerson v. Napolitano, 604 F.3d 732, 751 (2d Cir. 2010) (citing Broughton v. State, 37 N.Y.2d 451, 458 (N.Y. 1975)); Mitchell v. City of N.Y., 841 F.3d 72, 77 (2d Cir. 2016); Thompson v. Clark, 364 F. Supp. 3d 178, 193 (E.D.N.Y. 2019) ("The present rule placing pleading and proof burdens on plaintiffs in civil cases is not absolute.  For example, the Second Circuit has held in false arrest cases that

when an arrest is made without a warrant, the defendant bears the burden of proving probable

cause as an affirmative defense.").[44]

Defendant Doherty's summary judgment motion rests on just such a defense—he submits

evidence which he claims shows he had probable cause to arrest each Plaintiff.[45]  See

Defendants' Memorandum of Law, passim, ECF 39-1 (hereinafter "Defts' Memo at [page #]");

Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). "Probable cause requires an officer to have

'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable

caution in the belief that an offense has been committed by the person to be arrested.'"  Panetta

v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted).  When determining whether

probable cause existed for a plaintiff's contested arrest, it is well established that an officer had

---

[44] The Court notes that Dickerson and Mitchell were decided after other cases in which the
Second Circuit indicated that it had not yet addressed whether the probable cause burden lies
with the plaintiffs or the defendants regarding federal § 1983 false arrest claims.  Compare
Mitchell, 841 F.3d at 77; Dickerson, 604 F.3d at 751, with Warheit v. City of N.Y., 271 F. App'x
123, 125 (2d Cir. 2008 ("We have not yet addressed the question of whether the § 1983 plaintiff
has the burden of providing the absence of probable cause or whether the defendant has the
burden of providing its existence.");  Davis v. Rodriguez, 364 F.3d 424, 434 n.8 (2d Cir. 2004)
("This specific question—whether the plaintiff or the defendant in a § 1983 unconstitutional
false arrest case bears the overall burden of proof with regard to probable cause—has apparently
not yet been squarely discussed and decided in this circuit, and our indirect comments on the
burden of proof in such cases do not point conclusively in one direction or the other.").  Some
courts have previously placed the burden of establishing the absence of probable cause with the
plaintiff.  See, e.g., Lin v. City of N.Y., No. 14 Civ. 9994, 2016 WL 7439362, at *7 (S.D.N.Y.
Dec. 21, 2016) (citing Berry v. Marchinkowski, 137 F. Supp. 3d 495, 524 (S.D.N.Y. 2015)).  The
Court notes that Defendants' motion fails regardless of which party has the burden of proof as to
the existence or non-existence of probable cause.  See Jean v. Cnty. of Nassau, No. 14 Civ. 1322
(JMA) (AYS), 2020 WL 1244786, at *7 (E.D.N.Y. Mar. 16, 2020) (assuming  "that defendants
bear the burden or proving that there was probable cause for plaintiff's arrest"); Hoyos v. City of
N.Y., 999 F. Supp. 2d 375, 386 (E.D.N.Y. 2013) (declining to reach question of probable cause
burden given the plaintiff's claim would fail regardless of which party had the burden of proof).

[45] It is undisputed that Plaintiffs were confined by Defendant Doherty on the incident date, did
not consent, and that they were aware of the confinement.  See Clark v. City of N.Y., No. 13 Civ.
210 (ENV) (ST), 2016 WL 11469535, at *4 (E.D.N.Y. July 22, 2016) ("The dispute is, in
essence, whether the officers had probable cause to arrest[.]").

to have "individualized probable cause" for that person.  Egan v. City of N.Y., No. 16 Civ. 1479 (PGG), 2018 WL 4926445, at *20 (S.D.N.Y. Oct. 10, 2018) (collecting cases).  Stated differently, where an officer arrests more than one individual on the same set of facts, and those individuals all challenge the existence of probable cause as to them, the probable cause analysis asks whether the officer had probable cause to believe that each arrested individual committed an arrestable offense.  See Caravalho v. City of N.Y., No. 13 Civ. 4174 (PKC) (MHD), 2016 WL 1274575, at *5 (S.D.N.Y. Mar. 31, 2016); Pesola v. City of N.Y., No. 15 Civ. 1917 (PKC) (SN), 15 Civ. 1918 (PKC) (SN), 2016 WL 1267797, at *6 (S.D.N.Y. Mar. 30, 2016) (dismissing both plaintiffs' false arrest claims upon finding probable cause that each had committed offense).

In conducting this individualized probable cause analysis, "courts must consider those facts available to the officer at the time of the arrest and immediately before it."  Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) (citations and internal quotations omitted).   The court's duty is to look at the "totality of the circumstances" known to the officer at the time of the arrest to determine whether "a reasonable person in the position of the officer could have concluded that the [arrestee]" had committed the offense at issue.  Hoyos, 999 F. Supp. 2d at 386-87 (quoting People v. Farrell, 89 A.D.2d 987, 988 (2d Dep't 1982)).

Defendant Doherty argues that given the totality of circumstances known to him at the time of the arrests, he had probable cause to arrest Plaintiffs for committing actually charged offenses or ones with which he could have charged them, although he did not so charge.  For analysis, the Court groups these offenses and Defendant Doherty's related arguments as follows:

(i)     Defendant Doherty's allegations that Plaintiffs committed offenses pertaining to procuring and/or providing alcohol to minors.  See N.Y. Alco. Bev. Cont. L. § 65-a (misrepresenting the age of a person under the age of twenty-one years for the purpose of inducing sale of alcohol to minor); N.Y. Pen. L. § 260.10(1) (endangering the welfare of

a child); N.Y. Pen. L. § 260.20(2) (unlawfully dealing with a child in the first degree).[46]

(ii)     Defendant Doherty's allegations that Plaintiffs committed alcoholic beverage bottling and/or unlicensed sale offenses.  See N.Y. Alco. Bev. Cont. L. § 96-a (unauthorized bottling); N.Y. Alco. Bev. Cont. L. § 100.01 (unlicensed sale).

(iii)    Defendant Doherty's allegations that Plaintiffs committed offenses pertaining to recklessly endangering individuals' personal safety and property, permitting disorderly premises, and/or creating a criminal nuisance.  See N.Y. Alco. Bev. Cont. L. § 106.06 (disorderly premises violation); N.Y. Pen. L. § 120.20 (reckless endangerment in the second degree); N.Y. Pen. L. § 145.25 (reckless endangerment of property); N.Y. Pen. L. § 240.45 (criminal nuisance in the second degree).

(iv)    Defendant Doherty's allegations that Plaintiffs committed an offense pertaining to the security guards' lack of valid registration cards.  See N.Y. Gen. Bus. L. § 89-g.

(v)     Defendant Doherty's allegations that Plaintiff Lugo committed an offense for failing to respond to an appearance ticket in connection with the warrant.  See N.Y. Pen. L. § 215.58.

In response, Plaintiffs meet Defendant Doherty's evidence with their own evidence to show disputed material facts as to the claimed probable cause to arrest any of them on any of these cited offenses.

### b.  Defendant Doherty Fails To Establish Actual Probable Cause Pertaining To Direct Or Indirect Alcohol Provision Offenses

#### i.  Legal And Fact Issues Preclude Summary Judgment That Defendant Doherty Had Actual Probable Cause To Arrest Either Plaintiff For Direct Or Indirect Alcohol Provision To Minors

Defendant Doherty's motion claims that that he had actual probable cause to believe that each Plaintiff committed an offense by either (1) selling, serving, or otherwise providing alcohol to minors at the party (hereinafter "direct provision offense"), or (2) knowing of an turning a blind eye to underage drinking at the event (hereinafter "knowing acquiescence offense").  See Defts' Memo at 12-16.   Three of the statutes in Defendant Doherty's motion are relevant to

---

[46] The Court groups these offenses together in this category because Defendant Doherty cites to their relevant statutory language in these terms.  See Defts' Memo at 9-10, 15 n. 5, 8, 9.

Defendant Doherty's direct and indirect alcohol offense arguments: (1) Section 65-a of the New York Alcohol and Beverage Container Law ("ABC Law"), see N.Y. Alco. Bev. Cont. L. § 65-a; Section 260.10(1) of the New York Penal Law ("Penal Law"), see N.Y. Pen. L. § 260.10(1); and/or Section 260.20(2) of the Penal Law, see N.Y. Pen. L. § 260.20(2). Each Plaintiff's claims may rise or fall based on whether Defendant Doherty's evidence establishes lawful cause to arrest the Plaintiff under these laws.

### 1. Legal And Factual Disputes Preclude An Actual Probable Cause Finding Regarding Direct Provision Offenses

First, ABC Law § 65-a provides that

> [a]ny person who misrepresents the age of a person under the age of twenty-one years for the purpose of inducing the sale of any alcoholic beverage, as defined in the alcoholic beverage control law, to such person, is guilty of an offense and upon conviction thereof shall be punished by a fine of not more than two hundred dollars, or by imprisonment for not more than five days, or by both such fine and imprisonment.

N.Y. Alco. Bev. Cont. L. § 65-a. Defendant Doherty has not presented facts, and the Court can find none in its independent review of the record, that allege that either Plaintiff misrepresented the age of a person under twenty-one years of age for the purpose of inducing the sale of any alcoholic beverage. See 2006 N.Y. Op. Atty. Gen. No. 2, 2006 WL 469905 (distinguishing between sale prohibitions in another provision of the ABC Law and ABC Law § 65-a's prohibition on inducing alcohol sales to minors through misrepresentation of their age). The Court recommends that the Court find that Defendant Doherty did not have probable cause to arrest either Plaintiff on an offense arising under ABC Law § 65-a as a matter of law.

Next, Penal Law § 260.10(1) provides that a person is guilty of endangering the welfare of a minor when the person "knowingly acts in a manner likely to be injurious to the physical, mental, or moral welfare of a child less than seventeen years old[.]" N.Y. Pen. L. 260.10(1).

Penal Law § 260.20(2) provides that a person is guilty of unlawfully dealing with a child in the first degree when they "give[] or sell[] or cause[] to be given or sold any alcoholic beverage . . . to a person less than twenty-one years old[.]"  N.Y. Pen. L. 260.20(2).  As to these statutes the record has triable material fact disputes for jury resolution as to whether  Defendant Doherty had probable cause to believe that each Plaintiff committed direct provision offenses constituting endangerment or unlawful dealing.  For example, the four photos of scant party alcohol plausibly corroborate Plaintiffs' testimonial denials about any such direct provision at least as well as Defendant Doherty's argument that the photos bolster his claims of open and obvious teenage alcohol consumption at the party.  See Exh. 5; Ovadia v. Ming Fung Jewelry Corp., No. 04 Civ. 2692 (RWS), 2005 WL 78584, at *4 (S.D.N.Y. Jan. 12, 2005) (holding that "it is for a jury to assess the credibility of interested witnesses" including "the degree to which . . . photographs . . . corroborate [their] testimony"); Lepore v. 65 Whipple LLC, 61 Misc.3d 1202(A), 2018 WL 4470862, at *4 (Civ. Ct., Kings Cnty. Aug. 29, 2018) (finding photographic evidence of a site corroborated a witness's description of it).   This in turn implicates Defendant Doherty's credibility and requires denial of his summary judgment motion.  See Drake v. Handman, 30 F.R.D. 394, 396 (S.D.N.Y. 1962) ("[W]here . . . credibility, including that of the defendant, is crucial [], summary judgment seems particularly inappropriate.").  In other words, if a jury were to find that the reason for scant party alcohol photos is that there was no other party alcohol to photograph, the jury could plausibly side with Plaintiffs that Defendant Doherty fabricated evidence against them by staging the four empties on the counter after three of them were discovered in venue garbage cans, or that Doherty lied about smelling alcohol in the fruit punch. See Knox v. Cnty. of Putnam, No. 10 Civ. 1671 (ER), 2012 WL 4462011, at *5 (S.D.N.Y. Sept. 27, 2012) (holding that a district court may not make credibility determinations on summary

judgment once a material witness's credibility becomes a fact issue, collecting cases); see also 25-24 Café Concerto Ltd. v. New York State Liquor Auth., 65 A.D.3d 260, 262-63 (1st Dep't 2009) (finding liquor authority's determination unsupported by substantial evidence where evidence was a smell test but no field test was performed and officer had not tasted the contested drink)[47]; Alegre Deli, Inc. v. New York State Liquor Auth., 298 A.D.2d 581, 582 (2d Dep't 2002) (finding that determination of underage sale unsupported by substantial evidence where, among other things, the alleged alcohol or analysis of it was unavailable); K&Z Place, Inc. v. Casale, 248 A.D.2d 539, 540 (2d Dep't 1998) (finding "complete lack of evidence" to support determination that alcohol served to minor where the testifying officer at hearing had not tasted the beverage and could not identify what it was, i.e., type or brand).

Against this backdrop, Defendant Doherty is wrong that the guard accusation, contested in the record, establishes his actual probable cause to believe that each Plaintiff committed direct provision offenses.  This is because a jury could find that Defendant Doherty either fabricated the guard accusation (or at least unreasonably relied upon it) given such meager photographic and other evidence of alcohol at the party attended by so many and where Plaintiffs supposedly provided it so widely.  See McGee v. Doe, 568 F. App'x 32, 37-38 (2d Cir. 2014) (reversing pleading-stage qualified immunity for a defendant officer premised on an allegedly unreliable witness statement, holding that a court "must consider in combination the facial weakness of [a

---

[47] The substantial evidence standard is analogous to the probable cause standard.  It is "[m]ore than seeming or imaginary, it is less than a preponderance of the evidence, overwhelming evidence, or evidence beyond a reasonable doubt."  300 Gramatan Ave. Assocs. v. State Div. of Human Rights, 45 N.Y.2d 176, 180-81 (N.Y. 1978).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consol. Edison Co. v. Nat'l Labor Rel. Bd., 305 U.S. 197, 229 (1938); see La Forge, Jr. v. Kennedy, 7 N.Y.2d 973 (N.Y. 1960).  These cases are instructive as to the alcohol offenses.

witness's] statement with all of the other information possessed by the police defendants before making the arrest"); Creighton v. City of N.Y., No. 12 Civ. 7454 (PGG), 2017 WL 636415, at *28 (S.D.N.Y. Feb. 14, 2017) (explaining that where an informant's description of events is called into question, officers were required to consider whether there was corroborating evidence for the report including surveillance of incident scene).  This tension between the contested guard statement and other evidence is not helped by Defendant Doherty's failure to submit any sworn statement from the guards.  See Ridge, Inc. v. New York State Liquor Auth., 257 A.D.2d 625, 627 (2d Dep't 1999) (finding that minor's unsworn and controverted statement did not constitute substantial evidence to support finding of underage sale when controverted by testimony of the corporate petitioner's president); People v. Anderson, 25 Misc.3d 1207(A), 2009 WL 3130180, at *4 (Dist. Ct., Nassau Cnty. Oct. 1, 2009) (dismissing as facially insufficient an alcohol-related child endangerment criminal charge under Penal Law § 260.20(1) premised "almost exclusively on the hearsay statements of [officer]").[48]  Defendant Doherty's

---

[48] Whereas the court's dismissal of the allegations as facially insufficient in Anderson on this basis viewed the allegations and evidence in a light most favorable to the People, here, this Court is obliged to view the record in a light most favorable to Plaintiff.  Accordingly, the insufficiency of hearsay reliance in Anderson is even stronger in the context of the standard on this motion.

In addition, the fact that Defendant Doherty does not submit a sworn statement from the guard is problematic given that "[w]hat, exactly, [the guard] said . . . remains murky."  Clark, 2016 WL 11469535, at *1 n.1.  Defendant Doherty testified that he could not recollect much of what the guard said.  See Doherty Tr. 22:3-13 (Defendant Doherty testifying that he could not remember "exact words"); id. 25:20-26:24 (Defendant Doherty testifying that it wasn't "any lengthy conversation" and that Defendant Doherty learned nothing about "who was collecting the fee," whether the cover was for unlimited alcohol, or anything else about the system by which the cover-for-alcohol system was organized).  Given that there is no independent evidence in the record to support Defendant Doherty's unclear testimony about the guard's contested allegation, "[i]t cannot, therefore, prop up summary judgment."  Clark, 2016 WL 11469535, at *4 n.5 (rejecting defense argument that the alleged content of a document could be considered on summary judgment from a witness's testimony where the document was not in the record and its content contested).

contemporaneous writings about the incident say that one of these guards repeatedly gave

Doherty a false name during questioning; if a jury found that it was this guard who accused

Plaintiffs, it could also find that Defendant Doherty's awareness that the guard had just tried to

lie about his identity in the context of the licensing issue rendered him an incredible witness vis-

à-vis allegations he leveled against others.  See Exh. 4.[49]

### 2. Legal And Factual Disputes Preclude An Actual Probable Cause Finding Regarding Indirect Provision Offenses

Defendant Doherty's claimed probable cause to arrest each Plaintiff for indirect provision

offenses—in effect, based upon Plaintiffs' alleged failure to terminate known underage

drinking—is lacking as a legal question under the statutes Doherty cites.  Even if the laws

Defendant Doherty cites covered indirect provision conduct, fact issues would still require that

the probable cause question go to a jury.

Beginning with Penal Law § 260.10(1), its facial language requires and has been

construed to require an individual accused of child endangerment thereunder to have committed

an affirmative act for the offense to lie; in other words, Section 260.10(1) does not address acts

of omission.  See N.Y. Pen. L. § 260.10(1); People v. Spaldaccini, 124 A.D.2d 859, 859 (3d

Dep't 1986) (holding that endangering child welfare under Penal Law § 260.10(1) requires

affirmative acts and does not encompass acts of omission); id. (noting that acts of omission are

those where accused had a legal duty to terminate danger to a minor but failed to reasonably do

---

[49] At trial, Plaintiffs may try to impeach Defendant Doherty through questioning about his failure to include the guard's accusation in his detailed memo book entries.  See Exh. 4; Knox, 2012 WL 44622011, at *6; Moroughan v. Cnty. of Suffolk, No. 12 Civ. 512 (JFB) (AKT), 2015 WL 2412365, at *4 (E.D.N.Y. May 20, 2015) ("[T]hese are notes taken by a trained police investigator regarding interviews with witnesses to the events alleged in the complaint.  It is therefore hard to overestimate the importance of the notes to the plaintiff since they go directly to the claims asserted in the complaint.").

so)[50]; <u>Anderson</u>, 2009 WL 3130180, at *4 (finding information insufficient to sustain a prosecution under Penal Law § 260.10(1) where it alleged defendant's failure to terminate minors' known alcohol consumption, holding that Penal Law § 260.10(1) "requires the commission of some overt or affirmative act").

The facial language of Penal Law § 260.20(2) similarly requires the Court to deny Defendant Doherty's claimed probable cause based on indirect alcohol provision as a matter of law, as it is cast in terms of the affirmative provision of alcohol to minor as to which, as discussed <u>supra</u>, there are triable fact issues. <u>See</u> N.Y. Pen. L. § 260.20(2). In the context of indirect provision allegations, Penal Law § 260.20(2) does not contemplate an offense framed exclusively in terms of a party host's passive acquiescence. <u>See</u> <u>People v. Heil</u>, 28 Misc.3d 215, 221 (Rye City Ct. 2010) (analyzing "cause to be given" language in Penal Law § 260.20(2), and finding that the law's failure to include the word "permit" in its list of prohibited activities "must be read as an intentional omission of knowing passive acquiescence from its prohibition").[51]

---

[50] It may be that Defendant Doherty's counsel may have invoked and argued the wrong legal provision on the motion. <u>See</u> Defts' Memo at 5 n.5. It being Defendant Doherty's burden as movant to show his entitlement to the relief he seeks, it is not for the Court to <u>sua</u> <u>sponte</u> seek and analyze other laws which may have been a better fit.

The Court notes Defendants' citation to the distinguishable <u>People v. Jones</u>, 25 Misc.3d 995, 998-99 (Crim. Ct., N.Y. Cnty. 2009). <u>Jones</u> found a child endangerment charge facially sufficient under Penal Law § 260.10(1) where based on allegations that the accused openly kept marijuana and crack cocaine in a bedroom of his home where a seven-year-old child was also physically present. <u>See id.</u> In its analysis, <u>Jones</u> expressly distinguished why the drug possession fact pattern differed from ones involving alcohol possession. <u>See id.</u> at 999; <u>see also</u> <u>People v. Weyrick</u>, 55 Misc.2d 1063, 1064 (Ithaca City Court 1968) (dismissing as facially insufficient a child endangerment charge where it was not alleged that the party host provided the beer to the minors found to be drinking it).

[51] Defendants cite to the distinguishable <u>People v. St. Andrews</u>, 82 A.D.3d 1358, 1358-59 (3d Dep't 2011), in support of their claim that Penal Law § 260.20(2) applies to indirect alcohol provision to minors. <u>See</u> ECF No. 39-1 at 16. In that case, the court affirmed a conviction on evidence including credited testimony that the defendant bought beer and left it for her underage

Even if the offenses argued by Defendant Doherty encompassed indirect alcohol provision of the kind at issue here, Defendant Doherty has not established an actual probable cause finding thereunder as a matter of law due to disputed issues of material fact regarding whether either Plaintiff passively acquiesced to known underage drinking.  Much of the Court's above discussion already demonstrates this, i.e., a jury could find Plaintiffs' denials that they observed underage drinking at the party plausible when considered in tandem with the photographic evidence of only four empties (three of which Plaintiffs say were dug out of venue garbage cans during police search) after a party attended by 150-200 guests.[52]  See Exh. 5.[53]   As to Defendant Doherty's other arguments, they fail, too.

Beginning with the 911 call, Defendant Doherty implies that it should form part of the probable cause analysis.  He offers little explanation or legal citation for this position, but the Court notes that he impliedly invokes collective knowledge doctrine.  That doctrine holds that although "an arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion," he "may nonetheless act reasonably in relying on information received by other law enforcement officials."  United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001) (citations omitted).  The collective knowledge doctrine does not bring the 911 call into the probable cause analysis where there is no evidence that one officer "communicated

---

son and his friends.  Contrary to what Defendants suggest, that is more direct than indirect action.

[52] The Court incorporates the balance of its discussion of direct provision fact disputes by reference.

[53] Doherty claims that there was more alcohol on the counter at the party but that it does not appear in his photograph of the scene because Plaintiffs disposed of it when the party was shut down and Doherty went outside, i.e., between Doherty's first and second entries into Atlantis Hall.  See Exh. 5.  It is for a jury to consider Doherty's explanation for why the arrest evidence photos document so little alleged alcohol in light of the party's size.

his suspicions" to an arresting officer whose probable cause is contested.  United States v.

Hussain, 835 F.3d 307, 316 n.8 (2d Cir. 2016); see Colon, 250 F.3d at 136 (citing United States

v. Shareef, 100 F.3d 1491, 1504 & n. 5 (10th Cir. 1996) (declining to extend collective

knowledge doctrine where evidence showed officers had not communicated with each other;

"'[i]nformation scattered among various officers in a police department cannot substitute for

possession of the necessary facts by a single officer related to the arrest'"); Walsh v. Lunsford,

No. 14 Civ. 7108 (AKH), 2017 WL 2895943, at *4 (S.D.N.Y. July 7, 2017) ("Absent evidence

suggesting that [officers] actually relied on . . . information [that another officer] supplied, they

cannot invoke the fellow officer rule.").

Here, the 911 call accordingly cannot contribute to probable cause because the record not

only lacks such evidence that its content was communicated to Defendant Doherty, but

Defendant Doherty affirmatively testified that at the time of Plaintiffs' arrests he had no

knowledge that the 911 call had been made; instead, the arrests transpired during a walk-in.  See

DeCastro v. City of N.Y., 278 F. Supp. 3d 753, 771 (S.D.N.Y. 2017) (holding that although Taxi

and Limousine Commission (TLC) radio room operators may have had access to plaintiffs'

conviction or violation histories, collective knowledge doctrine "provide[d] no basis for

inferring" that knowledge to TLC inspectors in the absence of evidence that an operator had

conveyed it to them); Jackson v. Tellado, 236 F. Supp. 3d 636, 660-61 (E.D.N.Y. 2017) (holding

collective knowledge doctrine inapplicable under Hussain where record showed that officers'

knowledge about a plaintiff's arguable crimes "was not communicated" to two other officers

accused of false arrest); United States v. Peterson, No. 12 Crim. 409 (PAE), 2012 WL 4473298,

at *8 (S.D.N.Y. Sept. 28, 2012) (holding that information provided to 911 operator could not be

imputed to arresting officers where the operator did not communicate it to them).[54]

Even if the Court could consider the 911 call, it would not in any event much benefit Defendant Doherty's motion.  First, the caller reported secondhand information as to which she had no personal knowledge.  See Cortez v. McCauley, 478 F.3d 1108, 1118 (10th Cir. 2007) (holding that uncorroborated "double-hearsay statement of a nurse who had no personal knowledge of the actual facts" insufficient to establish probable cause) (emphasis in original). Second, the caller's report lacked meaningful details about the extent of the alleged underage drinking or Plaintiffs' role.[55]

Defendant Doherty's alleged interactions with Vlad and the two sixteen-year-olds are not dispositive because material facts as to these events are contested.  The totality of the circumstances require that these allegations be tried and include: (1) Plaintiffs' denial that there was alcohol on the counter or being handled by Ms. Baez during the party, see supra; (2) the absence in the record of any sworn statements from these three "missing" alleged witnesses (whom Defendant Doherty claims to have never encountered again after becoming distracted at the scene), see Ridge, Inc., 257 A.D.2d at 625 (finding that minor's unsworn and controverted statement did not constitute substantial evidence to support finding of underage sale); Anderson, 2009 WL 3130180, at *4 (dismissing as facially insufficient an alcohol-related child endangerment criminal charge under Penal Law § 260.20(1) premised "almost exclusively on the

---

[54] Assuming arguendo that 911 call facts had been conveyed to Defendant Doherty, the Court would likely still be unable to weigh its impact on probable cause without required evidence, absent in the record here, that the 911 operator had received training "directed in any way to developing" the operator's ability to assess probable cause.  Colon, 250 F.3d at 137.

[55] This in particular explains why the 911 call issue is more aptly a part of the Court's indirect provision analysis than its direct provision discussion.  The caller at most said that underage drinking occurred at the party, not that Plaintiffs provided the alcohol.

hearsay statements of [officer]"); see also Alegre Deli, 298 A.D.2d at 581 (finding that determination of underage sale unsupported by substantial evidence where, among other things, there was no documentary proof of the minor's age); and (3) Defendant Doherty's "smell test" on the teens' cups falls short of substantial evidence that they contained alcohol, see 25-24 Café Concerto Ltd., 65 A.D.3d at 260 (finding liquor authority's determination unsupported by substantial evidence where based on a "smell test" but no field test and officer had not tasted the contested drink); Alegre Deli, Inc., 298 A.D.2d at 581 (finding that determination of underage sale unsupported by substantial evidence where, among other things, the alleged alcohol or analysis of it was unavailable); K&Z Place, Inc., 248 A.D.2d at 539 (finding "complete lack of evidence" to support determination that alcohol served to minor where the testifying officer at hearing had not tasted the beverage and could not identify what it was, i.e., type or brand). Furthermore, it must be emphasized that Defendant Doherty alleges that these three alleged witnesses pointed at Ms. Baez as the source of their drinks.  Accordingly, assuming arguendo that a jury credited that the interactions occurred as Defendant Doherty claims, it leaves open for a jury whether three people pointing a finger at Ms. Baez arguably meant that each Plaintiff knew of underage drinking at the event and did nothing to stop it.[56]  The relevant question is not whether one or three or even ten of Plaintiffs' minor guests drank at the party; it is whether Plaintiffs knowingly ignored it.[57]  Even if Plaintiffs are incorrect as to some fact issues in this

---

[56] Once again, the Court would be remiss if it did not note that a jury could find the photos of scant party alcohol material to their deliberations on this question.

[57] In addition to Plaintiffs' testimony that they did not see underage drinking at the party, a jury could once again consider the photographic evidence of party alcohol relevant.  Stated differently, a jury could find that the photographs of minimal party alcohol corroborate Plaintiffs' account that they did not see underage drinking or alcohol other than their own personal bottle stored away.

litigation, "nonmovant[s are] not required to score 100% on their objections.  Even one material issue of fact in dispute is sufficient to defeat summary judgment as to [Plaintiffs'] arrest[s] by [Defendant Doherty]."  Brewton v. City of N.Y., 550 F. Supp. 2d 355, 364 (E.D.N.Y. 2008).  And again, once fact issues call Defendant Doherty's credibility into question, which they have, see supra, summary judgment is generally inappropriate.  See Knox, 2012 WL 4462011, at *5 (holding that a district court may not make credibility determinations on summary judgment once a material witness's credibility becomes a fact issue, collecting cases).

### c.   Defendant Doherty Fails To Establish Actual Probable Cause Pertaining To Unlawful Bottling Or Unlicensed Alcohol Sale Offenses

Next, Defendant Doherty argues that the record shows he had arrest probable cause under ABC Law bottling or unlicensed sale violations.  First, ABC Law Section 96-a(1) provides in relevant part that "[n]o liquor or wine may be bottled in this state except by the manufacturer thereof[.]"  N.Y. Alco. Bev. Cont. L. § 96-a(1).  And ABC Law Section 100(1) provides that "[n]o person shall manufacture for sale or sell at wholesale or retail any alcoholic beverage within the state without obtaining the appropriate license therefor required by this chapter."  N.Y. Alco. Bev. Cont. L. § 100(1); see N.Y. Alco. Bev. Cont. L. § 3(28) (defining sale in relevant part as "any transfer . . . for a consideration . . . of any alcoholic beverage").[58]

Defendant Doherty does not explain how the record supports his claimed probable cause to arrest each Plaintiff with respect to these offenses.  As best the Court can surmise, Defendant Doherty's argument is that Plaintiffs committed a bottling offense under ABC Law Section 96-

---

[58] The parties have not briefed whether ABC Law violations are arrestable offenses.  Under NY CPL Section 140.25(1)(a), an officer may arrest a person without a warrant for "any offense when he has reasonable cause to believe that such person has committed such offense in his presence," and under NY CPL Section 140.25(1)(b), for "a crime when he has reasonable cause to believe that such persom has committed such crime, whether in his presence or otherwise."

a(1) and a manufacturing for unlicensed sale offense under ABC Law Section 100(1) by making the fruit punch and charging a $10 cover to party guests.   The parties hotly dispute a central fact that would permit the Court to find Defendant Doherty's probable cause to arrest either Plaintiff on either of these offenses, i.e., whether or not the fruit punch was spiked.  If a jury believes Plaintiffs that the punch did not contain alcohol, and finds that Defendant Doherty fabricated that it was spiked, then Defendant Doherty would have lacked probable cause to believe that either Plaintiff violated Sections 96-a(1) or 100(1) of the ABC Law with respect to the punch.

Even assuming a jury finding that the punch were spiked, fact issues would remain as to who did it and whether both Plaintiffs knew that it was spiked.  So, too, would it be for a jury to decide the volume of punch actually spiked, which is relevant to whether Defendant Doherty had probable cause under ABC Law Section 100(1).[59]  See People v. Rides, 273 N.Y. 214, 217 (N.Y. 1937) (finding that while the manufacture of "unusual quantities of alcohol under some circumstances may justify the conclusion that there was an intention to sell," the manufacture of "even nine gallons" does not prove or tend to prove actual sale or intent to do so).   At deposition, Defendant Doherty testified that he smelled the contents of the plastic cup and two plastic containers (each approximately 10-12 inches high and 5-6 inches wide) photographed on the counter, and that it was from this test that he believed them to hold a mixed alcoholic beverage.  See Doherty Tr. 63:5-16 (testifying from photographs, see Exh. 5).[60]  Although Defendant Doherty argues that Plaintiffs' $10 cover charge renders the volume of allegedly

---

[59] Defendant Doherty does not submit argument or legal citation regarding whether spiking punch can constitute a bottling violation under ABC Law Section 96-a(1) even if triable fact issues did not require the Court to deny his motion on that basis.

[60] From this photographic and testimonial evidence, a jury could reach any number of plausible conclusions about punch volume.

spiked punch irrelevant to the question of sale under ABC Law § 100(1), in fact this does not settle the sale question given fact issues raised by credible evidence that the cover was instead meant to recover Plaintiffs' significant party expenses including the hall rental cost, the DJ's fee, and food and non-alcoholic beverage expenditures.  Compare Exh. 6 (showing that Plaintiffs collected approximately $1,363.00), with Exh. 7 (showing that Plaintiffs' $1,195 hall rental expenses in addition to paying for the DJ, food, water, soda, punch, disposable cups and more).

### d.  Defendant Doherty Fails To Establish Actual Probable Cause Pertaining To Reckless Endangerment Of Person/Property, Permitting Disorderly Premises, Or Creating A Criminal Nuisance Offenses

Defendant Doherty also argues that the record establishes his probable cause to arrest each Plaintiff for reckless endangerment, disorderly premises, or criminal nuisance offenses.[61]

Beginning with reckless endangerment, a person is guilty when they recklessly engage in conduct which creates a substantial risk of either "serious injury to another person," see N.Y. Pen. L. 120.20, or "damage to the property of another person in an amount exceeding two hundred fifty dollars," see N.Y. Pen. L. § 145.25.  In relevant part, a person is guilty of criminal nuisance when they knowingly or recklessly "create[] or maintain[] a condition which endangers the safety or health of a considerable number of persons."  See N.Y. Pen. L. § 240.45(1).

According to Defendant Doherty, the presence of 150-200 guests at Plaintiffs' party supports arrest probable cause that they committed reckless endangerment and criminal nuisance offenses because attendance exceeded the 160-person limit contained in the Contract.  In

---

[61] The Court understands Defendant Doherty's argument pertaining to these offenses to also include his allegations about alcohol among the totality of the circumstances relevant to the Court's probable cause analysis.  T he Court incorporates by reference its finding of fact issues pertaining to alcohol as discussed infra and its discussion in this section will focus on unique Defendant Doherty allegations implicated by reckless endangerment, criminal nuisance, and disorderly premises theories.

41

contrast, Plaintiffs say that it applies to Medina Hall and not Atlantic Hall (which Plaintiffs claim instead had a 275-person attendance limit).  Defendant Doherty's argument depends upon a fact that is wholly absent from the case record, i.e., the significance of the guest cap to the endangerment or nuisance offenses.  Without a shred of support, Defendant Doherty asks the Court to find as a matter of law that a violation of the contractual cap would also be a per se violation of some building code, fire, health, safety, or other governmental regulation that he does not identify.  Without a record from which to indisputably conclude that the contractual cap has such legal significance or that it was even violated, Defendant Doherty's argument presents a fact issue which the Court may not resolve in Defendant Doherty's favor at this stage.

The Court also denies Defendant Doherty's request that it find arrest probable cause under Section 106 of the ABC Law, which provides that "[n]o person licensed to sell alcoholic beverages shall permit . . . such premises to become disorderly."  See N.Y. Alco. Bev. Con. L. § 106.  As a preliminary matter, given that neither Plaintiff had such a license, the provision appears inapplicable on its face.  See People v. Knox, 25 Misc. 3d 34, 36–37, 887 N.Y.S.2d 759, 761–62 (App. Term 2009) (noting that Section § 106(6) "imposes liability on a 'person licensed,'" and reversing conviction and dismissing case against an unlicensed person).   Even if Section 106 could regulate unlicensed individuals such as Plaintiffs, fact issues would still preclude the Court's ability to determine as a matter of law whether the party constitutes "disorderly premises" when the need for police to "control" the 150-200 guests who dispersed largely on their own and in as few as 7 minutes from the party's end.[62]

---

[62] To the extent that Defendant Doherty means that the party was a disorderly premises as a more general matter, the record presents triable issues as to that contention, too.

      **e.  Defendant Doherty Fails To Establish Actual Probable Cause Pertaining To Security Guard License Offenses**

Arrest probable cause is also lacking as a matter of law under New York's Security Guard Act of 1992, which governs the registration, training and employment of security guards. See N.Y. Gen. Bus. Art. 7-A; N.Y. Gen. Bus. L. §§ 89-e to 89-w.  In relevant part, New York General Business Law § 89-g(1)(a) provides:

> Except as provided in this section and section eighty-nine-w of this article, no security guard company shall knowingly employ a person as a security guard and no person shall be employed as a security guard or act as a security guard unless . . . [t]he security guard company has verified with the department that such person possesses a valid registration card which has not expired or been revoked or suspended[.]

N.Y. Gen. Bus. Law § 89-g (McKinney).   In relevant part, a "security guard" is defined as a person employed by a security guard company to principally perform security-related functions, see N.Y. Gen. Bus. L. § 89-f(6), and a "security guard company" is defined as "any person . . . employing one or more security guards[,]" see N.Y. Gen. Bus. L. § 89-f(5).  Taking these provisions together, Section 89-g(1)(a) liability applies to security guard company employers with respect to their security guard employees' registration cards.

Here, record evidence shows that Defendant Doherty knew at the time he arrested Plaintiffs that (1) Plaintiffs had only rented Atlantis Hall as the venue for the party and were not its owners, (2) that its owner was not on the premises, and (3) that Plaintiffs had contracted the guards' services from the owner.  See Exh. 4 at DEF019 (Defendant Doherty memo book noting Plaintiffs' rental of hall and that owner not on the scene); Exh. F at DEF004, 007 (Defendant Doherty arrest report allegations noting Plaintiffs rented the location and "hired unregistered security at the location"); Exh. G at 011 (Defendant Doherty complaint report allegations, same).

All of these facts would permit a jury to plausibly find that, at the time of the arrests Defendant Doherty knew that Plaintiffs had only contracted the guards' services for the night of the party, and that Defendant Doherty therefore lacked constitutional privilege to detain Plaintiffs for an alleged offense under Section 89-g(a)(1), which imposes liability only upon employers.  See McLaughlan v. BR Guest, Inc., 149 AD3d 519, 520 (1st Dep't 2017) (defendant not liable for guard assault because the guard was an independent contractor and not employee).  Given that a jury could so find, the Court cannot now resolve these issues in Defendant Doherty's favor on summary judgment.

### f. Defendant Doherty Fails To Establish Actual Probable Cause Pertaining To Failure To Respond To An Appearance Ticket Offense

The contested bench warrant does not establish Defendant Doherty's entitlement to summary judgment, either.  At the outset, there is a fact issue regarding whether Defendant Doherty was relying on an active warrant because Plaintiff Lugo's evidence shows at least circumstantially that the warrant was inactive, i.e., he testified that he was released at the same time as Plaintiff Montanez after the prosecutor declined to prosecute them on party-related offenses without Plaintiff Lugo having to appear before a judge on the contested warrant allegedly specific to him.  See infra Section V.f.   Defendants do not meet Plaintiff Lugo's showing in this regard with the most obvious and ostensibly easy to obtain rebuttal evidence, i.e., the records that Defendant Doherty purportedly consulted at the relevant time that stated the warrant was active or records from a database now showing whether it remains active to this day and, if not, the date it was vacated.  See id.; see also Exh. 8 (the contested warrant with no indication on its face as to whether and when it was active as pertinent to the facts of this action).

The cases cited by Defendants are distinguishable.  In Welch v. City of N.Y., No. 95 Civ. 8953 (RPP), 1997 WL 436382, at *1 (S.D.N.Y. Aug. 4, 1997), the order of protection in

evidence and upon which the officer relied to arrest the plaintiff—though it had been subsequently vacated and amended—had language on its face stating it was valid until much later.[63]  In contrast, the contested warrant here displays no such facial validity upon which Defendant Doherty can claim to have relied.  See Exh. 8.  Another case, Coyle v. Coyle, 354 F. Supp. 2d 207, 212 (E.D.N.Y. 2005), is inapposite because there, officer relied upon a sworn complainant's allegation that the accused had violated an existing order of protection (even though it had actually been vacated).  Here, and as noted supra, Defendants have not submitted evidence about or from the source of Defendant Doherty's alleged information that the contested warrant was active; they say only that it came from a "computer check" about which the record is barren of any meaningful detail.

Even if there were no fact issue as to whether the Lugo warrant was active, Defendant Doherty's claimed probable cause to arrest Plaintiff Lugo for the warrant did not arise until after Defendant Doherty had already arrested Plaintiff Lugo on other contested offenses and discovered the warrant at the precinct.  Accordingly, Plaintiff Lugo's false arrest claim must "be measured by traditional principles of probable cause, based on an objective assessment of the information known to [Defendant Doherty] at the time of arrest."  Underwood v. City of N.Y., No. 14 Civ. 7531 (RRM) (PK), 2018 WL 1545674, at *3 (E.D.N.Y. Mar. 28, 2018) (denying summary judgment on a false arrest claim where the plaintiff contested probable cause for a detention that "preceded the discovery of [the plaintiff's] outstanding warrant," finding that the later discovery "says nothing about the lawfulness of effecting arrest prior to [that] discovery") (emphasis in original).  This means that even if Defendant Doherty's discovery of the Lugo

---

[63] The same is true for another case cited by Defendants, Calcarcel v. City of N.Y., No. 13 Civ. 1740 (KAM), 2014 WL 4370814, at *1 (E.D.N.Y. July 29, 2014), in which the contested order of protection on which the arrest was made also bore an expiration date later than the detention.

warrant gave him arrest probable cause at the precinct, this has no bearing on whether Defendant

Doherty had constitutional privilege to detain Plaintiff Lugo for the period leading up to that

moment.  See id.

Accordingly, Defendant Doherty's argument about the Lugo warrant does not entitle him

to summary judgment on Plaintiff Lugo's false arrest claim for two reasons.  There are genuine

disputes of material fact as to whether the warrant was active when Defendant Doherty

discovered it (which precludes a finding that it gave him probable cause to arrest Plaintiff Lugo

at that time) and as to Defendant Doherty's claimed probable cause for the period of Plaintiff

Lugo's contested detention during the period prior to the alleged warrant's discovery (assuming

arguendo it was open).  See id. at *3 n.3 (finding that under similar circumstances, a plaintiff's

"damages will be limited to the period between the time he was [originally] taken into custody . .

. until the discovery of the warrant at the precinct" later").[64]

### VI.  The Court Should Deny The Motion For Summary Judgment On Defendant Doherty's Qualified Immunity Defense

Even if probable cause does not exists, "[i]n the context of § 1983 actions predicated on

allegations of false arrest, . . . an arresting officer is entitled to qualified immunity so long as

'arguable probable cause' was present when the arrest was made."  Figueroa v. Mazza, 825 F.3d

---

[64] Given this result, the Court need not now reach other fact issues pertaining to the warrant, i.e., whether Plaintiff Lugo was even its subject and, if so, whether it was active at the time.  Cf. Tabb v. Hieronymi, No. 17 Civ. 4448 (GBD) (GWG), 2018 WL 3951345, at *5 (S.D.N.Y. Aug. 17, 2018) (rejecting plaintiff's argument of fact issue regarding arrant because it had not come up when he had appeared in court before, stating that this was irrelevant to whether officers viewed it as open in a database); Willis v. City of N.Y., No. 12 Civ. 5259 (RA), 2015 WL 556884, at *6-7 (S.D.N.Y. Feb. 9, 2015) (officer entitled to rely on inaccurate database information even if other evidence indicated warrant was not open).

The Court does note that Defendant Doherty fails to submit record evidence to the Court that shows whether the warrant was open or not.  Defendant Doherty did not testify about it, and his motion papers only annex an arrest report.  Doherty Tr. 40:11, 101:24.

89, 100 (2d Cir. 2016) (quoting <u>Zalaski v. City of Hartford</u>, 723 F.3d 382, 390 (2d Cir. 2013)).

Arguable probable cause is an objective standard.  It "exists if either (a) it was objectively

reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable

competence could disagree on whether the probable cause test was met." <u>Garcia v. Does</u>, 779

F.3d 84, 92 (2d Cir. 2015) (quoting <u>Zalaski v. City of Hartford</u>, 723 F.3d 382, 390 (2d Cir.

2013)).  "[W]hether an officer's conduct was objectively reasonable" depends on "the

information possessed by the officer at the time of the arrest," not "the subjective intent, motives,

or beliefs of the officer." <u>Id.</u> (quoting <u>Amore v. Novarro</u>, 624 F.3d 522, 536 (2d Cir. 2010)).

"Put another way, an arresting officer will find protection under the defense of qualified

immunity unless 'no reasonably competent officer' could have concluded, based on the facts

known at the time of arrest, that probable cause existed." <u>Figueroa</u>, 825 F.3d at 100 (citing

<u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).  "Therefore, in situations where an officer may have

reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless

entitled to qualified immunity." <u>Caldarola</u>, 298 F.3d at 162.  "Once disputed factual issues are

resolved, the application of qualified immunity is, however, ultimately a question of law for the

court to decide." <u>Finnegan v. Fountain</u>, 915 F.2d 817, 821 (2d Cir. 1990) (citing <u>Warren v.

Dwyer</u>, 906 F.2d 70, 76 (2d Cir. 1990)); <u>see</u>, <u>e.g.</u>, <u>Morris v. Silvestre</u>, 604 F. App'x 22, 25 (2d

Cir. 2015) (affirming district court's dismissal of false arrest claim on the grounds that it found

officers had at least arguable probable cause).

A valid qualified immunity defense can foreclose liability under § 1983.  "Qualified

immunity is an affirmative defense that shields government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." <u>Stephenson v. Doe</u>, 332 F.3d 68, 76

(2d Cir. 2003) (internal quotation marks & citation omitted).  A right is clearly established if "existing law . . . placed the constitutionality of the officer's conduct 'beyond debate.'"  Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  Under this standard, "all but the plainly incompetent or those who knowingly violate the law" are protected.  Id.  "The qualified immunity analysis . . . is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question." Hernandez v. Mesa, 137 S. Ct. 2003, 2007 (2017) (internal quotation marks omitted).

Courts generally engage in a two-step process to assess qualified immunity, looking first at whether the plaintiff makes out a violation of a constitutional right, and second, whether the violated right was clearly established at the time of the alleged misconduct.  See Pearson v. Callahan, 555 U.S. 223, 232 (2009).  This two-step process need not be applied where it would yield a largely academic analysis with little impact on the outcome of the case–where, for example, it is evident that an alleged right is not clearly established, whether or not it has been violated–thus the Court need not address both prongs where the latter will suffice.  See id. at 236.

Above, the Court has set forth why a factfinder must resolve the significant and material fact issues before the Court can determine as a matter of law whether Defendant Doherty had actual arrest probable cause to arrest either Plaintiff.   These questions include whether either Plaintiff (1) directly provided alcohol to minors, see Section V.b.i.1; (2) knew of underage drinking at the party and ignored it, see Section V.b.i.2; (3) caused or ignored hazardous or disorderly premises at Atlantis Hall, see Section V.d; or (4) were the employers of unlicensed security guards, see Section V.e.  "Depending on how a jury decides these disputes, the Court may or may not conclude that the factual circumstances gave rise to arguable probable cause." Charles v. City of N.Y., No. 11 Civ. 2783 (AT), 2014 WL 1284975, at *7 (S.D.N.Y. Mar. 31,

2014).  Accordingly, the Court must await a factfinder's resolution of these disputes before analyzing arguable arrest probable.   See Stansbury v. Wertman, 721 F.3d 84, 89-93 (2d Cir. 2013) (probable cause is evaluated on all evidence in its totality); Thomas v. City of N.Y., No. 14 Civ. 7513, No. 16 Civ. 4224, 2019 WL 3491486, at *7 (E.D.N.Y. July 31, 2019) (adopting magistrate judge's report and recommendation, finding that "[e]ven if reasonable officers could disagree as to the significance of [certain genuinely disputed] evidence, because the record does not establish [other disputed material facts], . . . a finding of arguable probable cause is precluded"); Clark, 2016 WL 11469535, at *5 n.6 ("[H]aving failed to show an objectively reasonable basis for probable cause to arrest [the civil rights plaintiff] for [the contested offense, the defendant officers] cannot rely on a qualified immunity defense."); id. (citing Boyce v. Fernandes, 77 F.3d 946, 948 (7th Cir. 1996) (Posner, J.) ("Where the only issue bearing on immunity is whether the [officer] had probable cause to make the . . . arrest that is challenged . . . the dispositive question is simply whether the defendant had probable cause[.]")).

Thus, the Court respectfully recommends that the Court find that Defendant Doherty is not entitled to qualified immunity because disputed fact issues preclude the determination of his arguable probable cause to arrest either Plaintiff at this juncture, and **deny** summary judgment to Defendant Doherty on Plaintiffs' false arrest claims.

### VII.    The Court Should Deny The Motion For Summary Judgment On  Plaintiffs' New York State False Arrest Claims Against Defendant Doherty

Courts have held that a federal § 1983 claim for false arrest resting on the Fourth Amendment right of an individual to be free from arrest without probable cause "is substantially the same as a claim for false arrest under New York law." Jenkins v. City of N.Y., 478 F.3d 76, 84 (2d Cir. 2015) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

Here, Defendants' summary judgment motion does not make a particularized argument

regarding Plaintiffs' state false arrest claims against Defendant Doherty.  See ECF Nos. 39-41.[65]

The Court finds that the same fact issues precluding a finding of actual probable cause on

summary judgment regarding Plaintiffs' federal § 1983 false arrest claims similarly preclude

dismissal of Plaintiffs' false arrest claims under New York law on that basis on the same record.

See Jenkins, 478 F.3d at 88 ("[I]f the officer's reasonableness depends on material issues of fact,

then summary judgment is inappropriate for both New York and federal false arrest claims.");

Goonewardena v. Spinelli, No. 15 Civ. 5239 (MKB) (ST), 2020 WL 1557745, at *7 (E.D.N.Y.

Mar. 5, 2020) (denying summary judgment on plaintiff's federal and state false arrest claims as

inappropriate in light of the parties' "dueling versions" of probable cause facts) report and

recommendation adopted in relevant part by 2020 WL 1550724 (E.D.N.Y. Mar. 31, 2020);

Westbrooks v. City of Buffalo, No. 11 Civ. 994S, 2014 WL 297107, at 2 (W.D.N.Y. Jan. 27,

2014) (holding that defendants' reliance on a disputed fact in their probable cause argument

"alone precludes summary judgment," and citing Jenkins for the proposition that "[t]his is true

for both the state and federal false-arrest claims").

     Nor does New York law require dismissal of Plaintiffs' state false arrest claims against

Defendant Doherty on the basis of qualified immunity under New York law.  In contrast to

---

[65] After noting Defendants' omission, the Court held a motion conference on August 12, 2020, to clarify why.  On the conference record, Defendants acknowledged that their motion to dismiss Plaintiffs' action in its entirety was intended to target both Plaintiffs' federal and state false arrest claims although their motion papers included no specific mention or discussion of the state claims.  See Dkt. Entry 8/12/2020.  Given the lack of clarity in Defendants' papers and the resulting gap in this aspect of briefing, the Court granted the parties' request for supplemental briefing on the subject of whether federal and New York State qualified immunity standards may differ.  See id.  The parties subsequently filed their supplemental positions on that subject, which the Court has considered.  See ECF Nos. 42-43.  The Court rejects Defendants' request that Plaintiffs' supplemental filings be deemed untimely.  See ECF No. 43.  The need for supplemental filing is attributable in the first instance to Defendants' incomplete filing as to which the Court required clarification.  Plaintiffs' submission is a response to Defendants' late-provided clarification and is timely.

federal qualified immunity doctrine, New York qualified immunity has a subjective component in addition to an objective one. See Lore v. City of Syracuse, 670 F.3d 127, 166 (2d Cir. 2012). The subjective component holds qualified immunity under New York law "entirely unavailable if there are 'undisturbed findings of bad faith.'" Id. (citing Della Pietra v. State of N.Y., 71 N.Y.2d 792, 795 (N.Y. 1988)).

On this record, the same fact issues precluding a finding of arguable probable cause for federal qualified immunity fail to establish the objective component of New York qualified immunity as a matter of law. See Washington v. Flaherty, No. 13 Civ. 8839 (LTS) (DCF), 2015 WL 3404176, at *3 (S.D.N.Y. May 27, 2015) (denying summary judgment as to plaintiff's federal and state false arrest claims after finding "[g]enuine disputes as to issues of material fact . . . preclude the grant of summary judgment in [d]efendant's factor on the basis of probable cause, whether on the merits or on qualified immunity grounds"); Hargroves v. City of N.Y., No. 03 Civ. 1668 (RRM) (VMS), 2014 WL 127104, at *3 (E.D.N.Y. Mar. 26, 2014) ("The objective components of both federal and New York qualified immunity analysis—the reasonableness inquiry—are essentially, coextensive."); Simpkin v. City of Troy, 224 A.D.2d 897 (3d Dep't 1996) ("Clearly, without a factual resolution of the sharply conflicting versions of [] events, it is not possible to determine whether defendants are qualifiedly immune.").[66]

In addition, whether the New York qualified immunity defense is available to Defendant Doherty at all is a triable fact question given that Plaintiffs' evidence suggests that Defendant Doherty acted in bad faith against them. For example, a jury could find such bad faith if it were to credit Plaintiffs' proof that Defendant Doherty fabricated evidence, i.e., by falsely stating that

---

[66] The Court notes the irrelevance of Defendants' argument that an officer entitled to federal qualified immunity is generally entitled to state qualified immunity given that the Court has not found that Defendant Doherty is entitled to federal qualified immunity. See ECF No. 43 at 3.

he found the four empties on the counter when they were instead retrieved elsewhere and staged, or by falsely stating that the fruit punch smelled like it was spiked when in fact it was non-alcoholic.  See Biswas v. City of N.Y., 973 F. Supp. 2d 504, 521 (S.D.N.Y. 2013) (denying New York qualified immunity to defendants on summary judgment where they allegedly deliberately fabricated evidence against plaintiff to have probable cause to arrest).[67]

For the foregoing reasons, the Court respectfully recommends that the Court **deny** Defendants' summary judgment motion with respect to Plaintiffs' false arrest claims against Defendant Doherty under New York law.

## VIII.   The Court Should Deny The Motion For Summary Judgment As To Plaintiffs' Respondeat Superior Claims Against The City Defendant

"New York courts have held municipalities liable under a theory of respondeat superior for false arrest . . . claims."  Graham v. City of N.Y., 928 F. Supp. 2d 610, 626 (E.D.N.Y. 2013). "The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment, and pursuant to this doctrine, the employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment."  Judith M. v. Sisters of Charity Hosp., 92 N.Y.2d 932, 933 (N.Y. 1999); see Green v. City of N.Y., 465 F.3d 65, 86 (2d Cir. 2006).

Here, evidence and allegation shows that Defendant Doherty was the City Defendant's

---

[67] Defendants themselves acknowledge that New York qualified immunity is unavailable where an officer acts in bad faith, noting that this would require a showing that the officer acted without legal authority or a lawful purpose.  See ECF No. 43 at 4.  They claim that no reasonable jury could find such bad faith here, but it is well-established that fabrication of evidence violates "an accused's clearly established constitutional right, and no reasonably competent police officer could believe otherwise."  See Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997).

officer employee, and that his arrest of each Plaintiff was committed within the scope of his

municipal employment.  See Doherty Tr. 6:6-8:15; 12:11-13:17, 120:4-14; see also Am. Compl.

¶¶ 10-14, 54-58.  On their instant motion, Defendants have not presented contradictory evidence

such that Defendants' summary judgment motion against Plaintiffs' respondeat superior claims

against the City Defendant should be denied.[68]  See Phelps v. City of N.Y., No. 04 Civ. 8570

(DLC), 2006 WL 1749528, at *7 (S.D.N.Y. June 27, 2006) (denying municipality's summary

judgment motion regarding respondeat superior claim, finding that "[t]he City has not argued,

much less shown, that the officers were acting outside the scope of their employment").

For the foregoing reasons, the Court respectfully recommends that the Court **deny**

Defendants' summary judgment motion with respect to Plaintiffs' respondeat superior claims

against the City Defendant.

---

[68] Although the Court need not reach the question of whether Plaintiffs' respondeat superior claims against the City Defendant must be dismissed if Defendant Doherty were found to be qualifiedly immune, it notes that Defendants argue this point.  ECF No. 43 at 5.  The Second Circuit suggested as recently as 2018 that this may be an open question.  Compare Pehush v. Ashworth, 757 F. App'x 47, 52 (2d Cir. 2018) ("Since we conclude that there are genuine disputes of material fact as to whether there was arguable probable cause, we need not consider whether, under New York law, when a claim against an officer is dismissed for qualified immunity, the claim must also be dismissed against the municipality.") (citations omitted), with ECF No. 43 at 5 (citing cases pre-dating 2018, some of which are distinguishable); see Verponi v. City of N.Y., 31 Misc.3d 1230(A), 2011 WL 1991719, at 12 (N.Y. Sup. Ct., Kings Cnty. May 19, 2011) ("However, while the individual police officers are entitled to immunity, the [d]efendant City of New York . . . may still be liable for the police officers' actions pursuant to the doctrine of respondeat superior.").  For example, in the context of Monell, courts have held that qualified immunity for an officer does not necessarily preclude municipal liability.  See Vives v. City of N.Y., 524 F.3d 346, 350 (2d Cir. 2008) ("Thus, a municipality is liable for even its good faith constitutional violations presuming that the municipality has a policy that causes those violations."); Nowacki v. Town of New Canaan, No. 16 Civ. 407 (JAM), 2017 WL 1158239, at *12 (D. Conn. Mar. 28, 2017) ("The entitlement of individual defendants to qualified immunity does not preclude Monell liability against the Town.") (citation omitted).

## IX. Conclusion

The Court has considered all of the arguments and evidence offered by the parties. For the foregoing reasons, this Court respectfully recommends that Defendants' motion for summary judgment should be granted in part, denied in part as follows:

1. **Granted** with respect to Plaintiffs' withdrawn federal failure to intervene, federal and state malicious abuse of process, federal Monell and catch-all § 1983 claims as made against any Defendant, and **granted** with respect to Plaintiffs' federal § 1983 false arrest claims against the City Defendant. See Section IV.

2. **Denied** with respect to Plaintiffs' federal § 1983 false arrest claims against Defendant Doherty. See Sections V, VI.

3. **Denied** with respect to Plaintiffs' false arrest claims against Defendant Doherty under New York law. See Section VII.

4. **Denied** with respect to Plaintiffs' respondeat superior claims against the City Defendant. See Section VIII.

In summary, the parties' remaining triable claims and defenses are: (1) Plaintiffs' federal § 1983 false arrest claims against Defendant Doherty; (2) Plaintiffs' false arrest claims under New York law against Defendant Doherty; (3) Plaintiffs' respondeat superior claims against the City Defendant; and (4) Defendants' qualified immunity defenses.

## X. Objections

Written objections to this report and recommendation must be filed within fourteen days of service of this report and in accordance with the Individual Rules of the District Judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections within the specified time waives the right to appeal. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

Dated:  Brooklyn, New York
        August 21, 2020

*Vera M. Scanlon*
VERA M. SCANLON
United States Magistrate Judge